[No. 70727-8. En Banc.]

Argued May 8, 2003. Decided January 29, 2004.

THE STATE OF WASHINGTON, *Respondent*, v. COVELL PAUL THOMAS, *Appellant*.

824

826

828

*Covell Paul Thomas*, pro se.

*Rita J. Griffith* and *Beth M. Andrus*, for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Barbara L. Corey-Boulet, Michelle Luna-Green*, and *Kathleen Proctor, Deputies*, for respondent.

*Sarah R. Knight* and *David R. East* on behalf of American Civil Liberties Union of Washington, amicus curiae.

[As amended by order of the Supreme Court January 29, 2004.]

IRELAND, J. — A Pierce County jury found Covell Paul Thomas guilty of one count of aggravated first degree murder, one count of residential burglary, and unlawful possession of a firearm in the first degree. The death penalty was imposed following the jury's determination that there were insufficient circumstances to merit le-

niency. We affirm each of his convictions but reverse his death sentence and remand for a new trial on the aggravating circumstances or for resentencing in accordance with this opinion.

## FACTS

*Events before Homicide*

Richard Geist owned a janitorial business that he had purchased from his mother, Reva Hall. Geist bought out part of the business; the remainder was purchased by Daryl Lynch, also known as Zaheed, who still owed Hall $144 at the time of the murder.

Geist hired Thomas in January or February 1998 to do custodial work for his business. They often socialized together outside of work. In March 1998, Thomas began talking to Lynette Ducharme, his then girl friend, about robbing Geist. Thomas knew that Geist would be paid between $4,000 and $5,000 at the end of March. When Ducharme asked Thomas what he would do if something went wrong during the robbery, he responded that he would shoot Geist.

Shortly before the murder, Thomas asked Ducharme's sister, Sandy, and Lisa Rodin, separately, whether they would be willing to distract Geist sexually as a "set-up" for $200. Neither woman accepted his offer.

Thomas also solicited his male friends to help him rob Geist. He contacted Jeremy Horyst about a month to two weeks prior to the day of the murder. During his conversation with Horyst, Thomas again acknowledged that he "might have to kill the dude," meaning Geist. Report of Proceedings (RP) at 4039. Horyst declined the offer. Horyst also testified that he had seen Thomas with a .38 caliber, semiautomatic gun around the time Thomas solicited him.

Ducharme testified that Thomas had told her about a week to two days before the murder that he had gotten his friend Edward Rembert to help him in the robbery. She testified that she often saw Thomas carry what she de-

scribed as a ".35 revolver long barrel" gun, although she was not certain it was a .35 caliber. RP at 3807. Ducharme never saw this gun again after the day of the murder. She also stated that she had never seen Rembert with a gun.

*Events on the Day of the Homicide: March 27, 1998*

Geist was paid $5,566.20 on the morning of March 27, 1998, and told Laurie Miller, his account manager, about his plans for that night with a friend from Portland. Geist cashed his check then waited at the office for Lynch who made a payment toward the balance owed to Hall.

Around noon to one o'clock, Geist came by Ducharme's mother's house to give Thomas his paycheck. Ducharme testified that that afternoon, Thomas reiterated his plan to rob Geist and to meet him under the guise that they were going out to meet some girls.

Between 6:30-7:00 P.M., Thomas and Ducharme left to pick up Rembert. On the way, Thomas again paged Geist. The three then went to pick up Desirée Azevedo, Rembert's girl friend. Ducharme explained that they would be dropping off Thomas and Rembert later because they had plans with Geist but did not, at that time, tell Azevedo that Thomas and Rembert were planning to rob Geist.

After drinking some Old English 800 malt liquor, Ducharme, with Azevedo, drove Rembert and Thomas to Geist's residence. Thomas told Ducharme to "sit and wait for him to call [her]" because she was supposed to pick them up later. RP at 3805. Ducharme recalled seeing Geist's van parked in front of his duplex. Ducharme and Azevedo returned to Ducharme's house to wait.

*The Homicide*

Raymond Cool is a janitor at Tacoma Baptist School and an unofficial security guard for the school.

On the night of the murder, Cool arrived at the school near 10:30 P.M. and was performing his rounds when his dog alerted him and ran around the corner of a building. Cool

followed and as he rounded the corner, he saw a man zipping his pants. It appeared as though he had been urinating. Cool noticed that in front of the man, on the ground, was a bottle of Old English 800 beer. Cool described this man as a slender, black male about 6 feet 0 inches or 6 feet 1 inch tall. Cool also noticed a van behind this man with the sliding door open. Cool admonished the man to get off the school property, whereupon a voice from the interior of the van responded challengingly, asking Cool who he was and what right did he have to tell them what to do and to confront them. Cool's response was that he was a security guard, but the man in the van did not believe him and wanted to see a badge. This man's tone made Cool feel as though he was in danger—even with his dog and a baseball bat. For a second time, Cool warned them to get off the property; again, the man inside the van responded with a challenging tone.

Cool shined his flashlight into the van and, based on what he could see, testified that he deduced the person within its interior was seated behind the driver's seat as that was the only area in the car that he could not see with the flashlight beam. No one was seated in either of the front seats. Cool testified that he perceived that the voice inside the van was that of an African American man.

Cool gave one last warning then left. From a distance, he noticed that the van backed down the hill and exited the gate that Cool had yet to lock and then paused on the side of the street. Cool continued to watch from his vantage point and "heard a huge commotion coming from the general direction of the van." RP at 3963. He then realized that the commotion and banging were gunshots—three to four of them. Two other witnesses who live in the area near Tacoma Baptist School testified they each heard multiple gunshots at this time—approximately 10:15-10:30 P.M.

Cool ran back to the school to call the police and returned to see where the van was. He noticed it slowly driving down the road. The police came and surveyed the area but did not talk to Cool. Cool later found an Old English 800 bottle in

the bushes near where he had encountered the van the night of the murder and told police. Cool was unable to identify from a photomontage the man he saw urinating.

*The Burglary*

Geist's neighbors in the duplex, Suzanne Sukauskas and Jameson McDougall, testified that Geist made every effort to come and go quietly since they had a small child. Geist's front door made a loud noise when opened or shut. Geist was always mindful of the door.

Early in the 11 o'clock hour the night of the murder, Sukauskas and McDougall heard Geist's van pull into the driveway and skid slightly on the gravel. They assumed it was Geist but heard a lot of fumbling with keys at the front door and described it as though someone was having trouble with the lock or trying to find the right key. They looked outside and saw Geist's van. Then they heard the front door slam shut, which made them doubt it was Geist since he was usually so quiet. The position of Geist's van in the driveway was also odd since it had been parked front-end first and the neighbors testified that he typically backed his car in. They heard a car pull up in the street out front playing loud music, then they heard a man knocking, then pounding on Geist's front door, calling out for Geist to open the door. This man then knocked softly on the neighbor's door then returned to Geist's door. McDougall peeked out the window and saw that the man knocking was a black male with dreadlocks and a pinstriped shirt.

This man was Cedric Walker, Geist's friend from Portland with whom Geist had also made plans for that night around 9:00 P.M. Walker drove a red Volvo. He testified that he had started knocking so vigorously because he had seen Geist's van parked in front and assumed he was home.

Walker then left, which McDougall saw through the window. McDougall also saw a white car briefly, and Sukauskas heard this car drive away since the music emanating from it died down as it did so. Neither saw the car Walker got into or knew whether the white car was

Walker's. Moments after Walker left, Sukauskas and McDougall heard two sets of footsteps rushing out of Geist's house and into the van. These two persons drove the van away from the house. Sukauskas and McDougall heard nothing more from Geist's house except his phone ringing shortly after the two individuals left in the van.

Ducharme received a phone call from Thomas about an hour after she had dropped him and Rembert off at Geist's house in which he said, "[i]t is done" and told her to hurry and pick them up. RP at 3809, 4855. She noted that he sounded rushed. As Ducharme pulled up to Geist's house in her white Plymouth Sundance, she saw a man (Walker) knocking at the front door. Earlier that afternoon when Geist was dropping off Thomas's paycheck Geist had mentioned a friend from Oregon might be coming up that night, and she assumed the person knocking was that friend. Not seeing Thomas, she waited down the street. Ducharme testified that she had a very loud stereo system in her car at the time.

Ducharme did not wait long before Geist's van, driven by Thomas with Rembert in the passenger seat, passed Ducharme; she followed. Walker had also seen the van driving away from Geist's house and followed it. Walker tried to pull up next the van, still thinking Geist was driving it. He was unable to see clearly the features of the man driving but noted that neither the passenger nor the driver looked to him like Geist. Whoever was driving was bigger than Geist and was wearing a starter jacket with a hood partially covering his face. Walker described the man as a light-skinned African American male and noted that there was a smaller passenger in the van too. Walker continued following for a little while but gave up and called Geist from a pay phone at 11:20 P.M. He went back a third time to Geist's house and noticed Geist's van was gone. He called Geist one last time at 11:33 P.M.

Meanwhile, Ducharme was still following Thomas who was driving Geist's van, which pulled over eventually. Thomas asked Ducharme for a place to burn the van; she

led them to Gig Harbor. When they arrived in Gig Harbor at the location she had in mind, Thomas and Rembert exited the van, and Ducharme and Azevedo noticed they were each soaked in blood. Thomas used a bottle of perfume and Azevedo's coat to start the fire. Once the fire had been set, the four settled into Ducharme's car—Azevedo and Rembert were seated in the backseat and Thomas was in the front passenger seat. Thomas and Rembert sat on compact disc cases and clothes to keep blood off the upholstery in the car. Ducharme and Azevedo testified that when Thomas got in the car he laughed "a real evil, weird laugh" that Ducharme had never heard from him before. RP at 3827, 4868. Rembert was quiet the entire time. Azevedo testified that he appeared scared; his legs were shaking as though he was in shock and a tear fell down his face. She had never seen him like that before. Azevedo testified that Rembert whispered to her, "Des, he shot him. He shot him. He shot him in his head." RP at 4868.

The foursome headed from Gig Harbor to Azevedo's house so that Thomas and Rembert could change their clothes and clean up. Thomas gave Rembert some cash that he told Ducharme later that night was from Geist's bedroom. He had between $4,000 and $5,000 and kept more for himself than he gave Rembert. Thomas admonished them that if they all kept quiet, they would get away with it. They stayed at Azevedo's house for approximately 15 minutes before Thomas and Ducharme headed over to her mother's house. They placed Thomas's and Rembert's blood-soaked clothes in a plastic bag and disposed of it on the way. Thomas also disposed of his bloodied shoes on the way, tossing them into a wooded area near Mount Tahoma High School. Sometime after the murder, Thomas told Ducharme that he had gotten rid of the gun he had used in the killing and that she should not worry about it. On the way to Ducharme's mother's house, Thomas told Ducharme that Geist "was gone" and when she asked if he "went quick" Thomas said, "[y]es." RP at 3833-34. Ducharme did not believe Thomas's claims that Geist was dead, so Thomas

directed her to Geist's body, which was "across the street from Tacoma Baptist." RP at 3834-35. Ducharme confirmed this at trial. At some point, while talking about the events of the night, Thomas told Ducharme that there had been someone at the door when he and Rembert were inside Geist's house looking for the money.

*Events in the Days and Months Following the Homicide*

The day after the murder, Thomas proposed to Ducharme and they were married in August 1998, three months after their son was born. The day Thomas proposed, he talked to Rembert to verify whether Azevedo was "going to keep her mouth shut . . . ." RP at 4873. Thomas and Rembert were seen with new items, such as clothes, by several people in the days and weeks after the murder and burglary.

Sometime after the wedding, Ducharme told her sister, Sandy, and a friend, Alexandra Wright, that Thomas had killed Geist. Sandy described Ducharme as "crying hysterically" and that she was telling them the truth because she was afraid for her life. RP at 4066. Thomas had been threatening Ducharme that he would kill her and their son if she told anyone, and that he would kill Sandy if Ducharme told her. If Ducharme talked to the police, he threatened to "take [her] down with him." RP at 3847-48. Ducharme told Sandy and Wright that she wanted to tell them what happened in case Thomas killed her.

*The Investigation and Forensics Results*

*At the Scene of the Homicide*

The investigation of the area where Geist's body was found revealed that his body had been dragged from the curb to where he laid. There were two sets of bloody footprints walking to and from the body. Geist's pager was found with blood on it and phone numbers were recovered from its memory. Blood covered the area.

The medical examiner estimated Geist's time of death to be near 10:00-10:30 P.M. on March 27, 1998. The cause of

death was multiple gunshots to the back of the head. At least one bullet entry showed evidence of having been shot from extremely close range, i.e., within two to three feet.

### At the Burn Site

Fire crews were called to a car fire in Gig Harbor. When the crews arrived, the van was completely aflame. The fire burned the van entirely, leaving only the frame. A bullet jacket and shell casing were recovered from the interior of the van. Forensics showed the bullet jacket had been fired most probably from a .38 or .357 magnum revolver. Bullet fragments recovered from Geist's skull during the autopsy could have been from the same type of gun. No residue of an accelerant was detected.

### Geist's House

Police discovered evidence of a burglary at Geist's house the day after the murder. Geist's blood was found inside—on the floors and the bathroom sink. Bloody shoe prints were found that were also in Geist's blood. The dresser was opened and the contents strewn on the floor. The drawer of a file cabinet in the bedroom closet was open. No identifiable fingerprints were recovered.

### Early Homicide Investigation

At first, police targeted Daryl Lynch as a possible suspect and arrested him. Sometime between March 28 and March 31, 1998, police contacted a Delores Coleman who had called alleging she had information about the homicide. She stated that on her way to drop her daughter off at a bingo hall at approximately 7:30 P.M. on March 27, 1998, she saw a dark colored van, with Geist seated in the front passenger seat, pulled over to the side of a road with a blue Volvo parked behind it. She also noted that she saw three people in the Volvo and that the rear door of the van was open. She told police that the driver of the Volvo was a white male with medium brown hair with an earring. She saw Geist's photo on television following the murder and contacted the

police after recognizing him as the man she saw in the van. On March 31, 1998, she identified Lynch as being the driver of the van from a photomontage in which a picture of Thomas was not included, stating, "That's as close as I can get. It's the eyes. It's the eyes. That's the guy that was driving the van." Clerk's Papers (CP) at 1029. However, Lynch was released after his arrest and was never charged because he had alibis that were verified by police.[1]

The first break in the case came in January 1999 when a Kenneth Adams approached police stating that he knew people who might have information about Geist's murder. One of the people Adams named was Horyst, so police obtained a court ordered intercept to record a conversation between the two. Based on this recorded conversation, police contacted Horyst who made a statement that Thomas had solicited him to help in a robbery of Geist. The information Horyst provided also led the police to Rembert.

While Ducharme initially denied any knowledge of Geist's murder to police, she was arrested on January 26, 1999, and made a taped statement prior to making any special promises to the police or plea agreements with the State. She also directed police to the wooded area where Thomas had dumped his shoes the night of the murder. Based on her information, police recovered a black tennis shoe that Ducharme identified at trial as being the same type worn by Thomas the night of the murder. The blood on the shoe was insufficient to yield a DNA (deoxyribonucleic acid) sample. Ducharme did, eventually, enter a plea agreement whereby she pleaded guilty to first degree robbery and rendering criminal assistance in exchange for divorcing Thomas in order to testify against him, as well as testifying against Rembert and Azevedo. Azevedo's plea agreement required her to testify against Thomas, Rembert, and Ducharme in exchange for a charge of first degree rendering criminal assistance.

---

[1] Police verified that Lynch's personal identification number had been used to enter a business he was contracted to clean that night and that he entered the business at 11:35 P.M. and exited at 11:48 P.M.

## ANALYSIS

### I. Jury Instructions

#### A. As Compared to *State v. Roberts*

Thomas contends that the "to convict" and accomplice liability instructions and the aggravating factors special verdict form given in his case allowed the jury to sentence him to death without requiring the State to prove that he personally caused Geist's death and that the aggravating factors specifically applied to him. He argues that the trial court erred in denying his motion for a new trial based on these instructional errors and that the court's factual findings supporting its conclusion that Thomas was a major participant in the crime of first degree murder with aggravating factors were not supported by the evidence in the record for the guilt phase of his trial.

Thomas's ultimate argument is that, according to *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000), (1) his conviction for first degree murder must be reversed due to the errors in his "to convict" and accomplice liability instructions, because they failed to require proof of an element of the crime of first degree murder, premeditated intent; (2) he may not be found guilty of first degree murder under an accomplice liability theory because the State did not prove that he personally had knowledge he was facilitating the crime charged, i.e., first degree murder; and (3) his death sentence must be reversed due to the error in the aggravating factors special verdict form in conjunction with the "to convict" instruction because they did not require the jury to find he was a major participant in the murder or the events leading up to it and that the aggravating factors applied specifically to him, rather than to just his accomplice, Rembert.

The State contends that any error in those instructions and the special verdict form is subject to harmless error analysis and was, in fact, harmless in this case.

### 1. Death Penalty Pursuant to "To Convict" and Aggravating Factors Instructions

Both the "to convict" instruction and the aggravating factors special verdict form in Thomas's case were substantially the same as those found to be erroneous in *Roberts*. In *Roberts*, we reversed that defendant's death sentence given under the same "to convict" and aggravating factors instructions as were given in Thomas's trial. *Roberts* held, in part, that where a defendant is being tried for first degree aggravated murder solely as an accomplice, that defendant's major participation in the murder or events leading up to the murder must be proved before the death penalty can be imposed. *Roberts*, 142 Wn.2d at 503 (citing *Tison v. Arizona*, 481 U.S. 137, 158, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987)).

In *Roberts*, the "to convict" instruction was erroneous because it "informed the jury that the elements of the crime could be committed by Roberts 'or someone to whom he was an accomplice . . . .' Therefore, the 'to convict' instruction did not require the jury to find that Roberts acted with premeditated intent . . . ." *Id.* at 504 (quoting clerk's papers). This was true despite a special interrogatory where the jury had found Roberts acted with premeditated intent. *Id.* The instruction also did not require a showing that Roberts had personally caused the death or that he actively participated in the events leading up to the death, i.e., his major participation. *Id.*

The aggravating factors instruction in *Roberts* read:

"(1) The defendant and his accomplice committed the murder to conceal the commission of a crime or to protect or conceal the identity of the person committing a crime; or

"(2) The murder was committed in the course of, in furtherance of, or in immediate flight from a robbery in the first or second degree or a kidnapping in the first degree."

*Roberts*, 142 Wn.2d at 504 (quoting clerk's papers). This court noted that while the first question required some form of actus reus by virtue of the word "and," how much was not

specified. The second question was worded in the passive voice such that no finding of actus reus on the part of the defendant was required. *Id.* This instruction was problematic because a jury that answered affirmatively to both questions could impose the death penalty even if Roberts did not personally cause the death or if he were only a minor participant in the events leading up to the death. *Id.*

 The "to convict" and aggravating factors instructions were erroneous in conjunction with one another because they "allow a defendant to be sentenced to death without a showing that he or she personally caused the victim's death or was a major participant in the homicidal acts." *Id.* at 506. Thus,

> [w]hen jury instructions as used in [Roberts's] case allow for the possibility that the defendant was convicted solely as an accomplice to premeditated first degree murder, the defendant may not be executed unless the jury expressly finds (1) the defendant was a major participant in the acts that caused the death of the victim, and (2) the aggravating factors under the statute specifically apply to the defendant.

*Id.* at 508-09. These findings by the jury should be done through special interrogatories when the State is trying its case based on accomplice liability. *Id.* at 509 n.12. Thus, contrary to Thomas's assertion, a jury is not required to find the defendant *personally* killed the victim in order to support a death sentence, only that he was a major participant in the events leading up to the victim's death.

While Thomas did not object at trial to the aggravating factors and "to convict" instructions, as noted in *Roberts*, "[e]xtensive authority supports the proposition that instructional error of the nature alleged here is of sufficient constitutional magnitude to be raised for the first time on appeal." *Roberts*, 142 Wn.2d at 500. Thomas is correct in his insistence that the error in his aggravating factors instruction is more egregious than that in *Roberts* because the first question in Thomas's instruction reads: "[t]he defendant *or* an accomplice committed the murder to conceal the commission of a crime or to protect or conceal the identity of any

person committing a crime . . . ." CP at 1461 (emphasis added).[2] The "or" removes a requirement that the jury find *any* form of actus reus *at all* on Thomas's part and relieves the State of its burden to prove the aggravating circumstances as they pertain to the defendant. *See Roberts*, 142 Wn.2d at 504. That is to say, this instruction permits the jury to impose a death sentence on Thomas even if it finds that the aggravating factors apply only to Rembert, his accomplice. Thomas's "to convict" instruction, as in *Roberts*, does not require the jury to find he acted with premeditated intent.

### 2. First Degree Murder Conviction Pursuant to Accomplice Liability Instruction

■ Thomas contends that the accomplice liability instruction was erroneous because it relieved the State of its burden to prove he acted with knowledge that his actions would promote or facilitate the murder. Relying again on *Roberts*, Thomas points out that his instruction suffers from the same deficiencies as the accomplice liability instruction in that case. Namely, the instruction here specified that

[a] person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of *a crime*, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing a crime.

CP at 1450 (emphasis added). The shortcoming of this *instruction* is that it does not require that the defendant had knowledge he was facilitating *the* crime for which he was charged. *See Roberts*, 142 Wn.2d at 510-11; *State v. Brown*, 147 Wn.2d 330, 338, 58 P.3d 889 (2002). In contrast, the accomplice liability *statute* does require a mens rea of

---

[2] Recall that this same instruction in *Roberts* read " '[t]he defendant *and* his accomplice,' " which, even still, the *Roberts* court found to be problematic. *Roberts*, 142 Wn.2d at 504 (emphasis added) (quoting clerk's papers).

"knowledge" of "the crime"—meaning, the charged offense. RCW 9A.08.020(3)(a); *see also Roberts*, 142 Wn.2d at 510.

### 3. Invited Error

The parties debate whether Thomas invited the error in the accomplice liability instruction. The State claims that although the defendant originally submitted a proposed accomplice liability instruction which differed from the court's, it was affirmatively withdrawn. Br. of Resp't at 120. The defense does not deny the facts alleged by the State but claims that its withdrawal was based on the failure of authority after the Court of Appeals withdrew its opinion in *State v. Hung Van Nguyen*, 94 Wn. App. 496, 972 P.2d 573 (1999). The prosecution proposed the instruction. The defense claims that in the absence of authority to the contrary it had no basis to challenge the pattern instruction. The State bears the burden of proof on invited error. Under the circumstances we characterize defense counsel's action as a failure to object rather than inviting error. As noted above, an error may be raised for the first time on appeal if it is a manifest error involving a constitutional right. RAP 2.5(a)(3); *Roberts*, 142 Wn.2d at 500-01.

### B. Harmless Error Analysis

### 1. "To Convict" Instructions

An omission or misstatement of the law in a jury instruction that relieves the State of its burden to prove every element of the crime charged is erroneous. *Brown*, 147 Wn.2d at 339. However, not every omission or misstatement relieves the State of its burden. *Id*. This court has adopted the rule that an erroneous jury instruction that omits an element of the charged offense or misstates the law is subject to harmless error analysis. *Neder v. United States*, 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); *Brown*, 147 Wn.2d at 339. "[A]n instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable

vehicle for determining guilt or innocence." *Neder*, 527 U.S. at 9. The *Neder* test for determining the harmlessness of a constitutional error is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id*. at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). As applied to omissions or misstatements of elements in jury instructions, "the error is harmless if that element is supported by uncontroverted evidence." *Brown*, 147 Wn.2d at 341 (citing *Neder*, 527 U.S. at 18). Thus, in *Brown*, the error in the accomplice liability instruction was harmless beyond a reasonable doubt where there was sufficient evidence in the record indicating the particular defendant was a principal in certain of the charges. *Id*.

The same logic used in *Brown* for accomplice liability instructions applies to erroneous "to convict" instructions. We may therefore uphold Thomas's underlying conviction for first degree murder if the errors in the accomplice liability and "to convict" instructions are harmless beyond a reasonable doubt.

Weeks before the night of the murder and burglary, Thomas solicited friends to assist him in robbing his boss. Thomas twice voiced his commitment to having to shoot Geist if he had to—both to Ducharme and to Horyst.[3] Everyone declined his offer save Rembert, who accepted just days before. Thomas was the one who knew Geist and knew that Geist would be receiving a large paycheck for several thousand dollars on March 27, 1998, as Thomas was Geist's employee. In whole, Thomas was the one who conceived of the plan and came up with the strategy. There was evidence identifying Thomas as the one who placed several phone calls to Geist before Thomas and Rembert were dropped off at Geist's residence by Ducharme and Azevedo. Thomas, not Rembert, called Ducharme after the

---

[3] Recall that Ducharme testified that when Thomas was explaining to her his plan to rob Geist for $4,000-$5,000, he stated that if something went wrong, he would shoot Geist. Horyst testified that while Thomas was trying to recruit Horyst to help him rob Geist, Thomas admitted that he might have to kill Geist.

burglary and told her to come get them. Thomas, not Rembert, was driving Geist's van and asked Ducharme where they could burn it. Testimony at trial revealed that Thomas, not Rembert, set the van on fire. Both Thomas and Rembert were covered in blood, so much so that Ducharme testified that they sat on compact disc covers and whatever else was in her car to keep the blood off the upholstery. There is Rembert's excited utterance that Thomas had shot Geist. Thomas also directed Ducharme to Geist's body, the same place it was found the morning of March 28, 1998. As the State aptly summarizes:

> Under the evidence that was presented, it was [Thomas] who: devised the plan to rob; thought about killing Geist beforehand; was friends with the victim and could lure him out on false pretenses; brought his gun with him that evening; was known to the victim and thus, had to eliminate him as a witness; solicited others to help him in his plan.

Br. of Resp't at 132-33 (emphasis omitted). We agree that "[Thomas] was so entrenched as a major participant in the murder that his culpability cannot be lessened even if his accomplice pulled the trigger." *Id.* at 133. For purposes of upholding Thomas's conviction for *first degree murder*, we find the errors in the accomplice liability and "to convict" instructions to be harmless beyond a reasonable doubt. We thereby affirm Thomas's conviction for first degree murder.

Thomas next argues that his residential burglary conviction must be reversed by virtue of the error in the accomplice liability instruction. Instruction 33, the "to convict" instruction for residential burglary, allowed the jury to convict for that crime if it found, beyond a reasonable doubt, that "the defendant or an accomplice entered or remained unlawfully in . . . the dwelling of Richard Geist." CP at 1478. He contends that his intent to facilitate or promote the crime of burglary was not a required showing under the accomplice liability instruction.

At trial, Ducharme testified that Thomas had told her he had heard someone knocking on Geist's door when he and Rembert were inside looking for the money. The error here

is harmless for purposes of Thomas's burglary conviction, as it was for the first degree murder conviction, because there is proof beyond a reasonable doubt that Thomas was a principal in the burglary. Thomas's residential burglary conviction is affirmed.

### 2. "To Convict" Instructions: When Aggravating Circumstances Are Present

We now turn to whether a harmless error analysis is available for an erroneous "to convict" instruction in cases involving aggravating circumstances. The Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) govern that determination.

In *Apprendi*, the Supreme Court held that, besides prior convictions, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (O'Connor, J., dissenting). The Supreme Court extended *Apprendi* to capital cases in *Ring*, holding that the sixth amendment to the United States Constitution requires the jury to determine the existence of any aggravating circumstance upon which a capital sentence is based. 536 U.S. at 609.

There can be no debate that a sentence of death is more severe than a sentence of life with the possibility of parole, the maximum statutory sentence for first degree murder. Thus, we may not undertake a harmless error analysis of the errors in these instructions for purposes of affirming a death sentence. We must then decide whether we may at least affirm Thomas's conviction for aggravated first degree murder and uphold the other sentence for that crime—life without the possibility of parole.

Our decision on that point is determined by our conclusion as to whether there is a significant difference between the sentences of life with the possibility of parole and life without. If there is none, then *Apprendi* and *Ring* are not at

issue because we would not view life without parole as an increased sentence as compared to life with parole. We have already held that under the statutory scheme in Washington the aggravating factors for first degree murder are not elements of that crime but are sentence enhancers that increase the statutory maximum sentence from life with the possibility of parole to life without the possibility of parole or the death penalty. *State v. Kincaid*, 103 Wn.2d 304, 312, 692 P.2d 823 (1985). However, in *In re Personal Restraint of Grisby*, 121 Wn.2d 419, 427-28, 853 P.2d 901 (1993), this court held that there was no significant difference between a life sentence and life without the possibility of parole. We later reiterated this sentiment in *State v. Rivers*, 129 Wn.2d 697, 714, 921 P.2d 495 (1996), in the context of the three strikes law. For several reasons, we hold that there *is* a significant difference between a life sentence with parole and a sentence of life without parole in the context of capital sentencing.

First, *Grisby* was a pre-Sentencing Reform Act of 1981, chapter 9.94A RCW, case and is therefore distinguishable. Second, it is clear that the legislature intended a life sentence with the possibility of parole and a sentence of life without parole to be wholly different. By statute, a defendant charged with murder is not eligible for *either* life without parole or the death penalty unless aggravators are found beyond a reasonable doubt. Without a showing of aggravators, the maximum sentence is life *with* the possibility of parole. This statutory scheme reveals that the legislature perceived life without parole to be a harsher sentence than just life. Third, although *Rivers* notes that life with parole and life without parole are not significantly different, *Rivers* did not have an *Apprendi* problem since the aggravators in the three strikes context are prior convictions and are therefore excepted under the *Apprendi* rule. *See Rivers*, 129 Wn.2d at 714-15 (citing *State v. Lee*, 87 Wn.2d 932, 937, 558 P.2d 236 (1976)). Thus, a sentence of life without parole is an increased sentence as compared to life with the possibility of parole in capital cases.

As discussed above, we have held that errors in "to convict" instructions are generally subject to harmless error analysis. However, a harmless error analysis of an erroneous jury instruction may not be available to uphold an aggravated conviction or sentence under *Apprendi* and *Ring*. That is the case here. To do a harmless error analysis to uphold Thomas's death sentence and conviction for aggravated first degree murder would be to find facts (aside from prior convictions) that increase the penalty for the crime charged beyond the statutory maximum, here, life with the possibility of parole. Under *Apprendi* and *Ring*, the jury must decide whether the aggravating factors have been proved beyond a reasonable doubt for Thomas to be sentenced to either life in prison without the possibility of parole or death because both of these sentences are more severe than life with the possibility of parole. Accordingly, we reverse Thomas's aggravated first degree murder conviction and death sentence and remand for a new trial on aggravated first degree murder or for resentencing on first degree murder.

Under the facts of this case, there is overwhelming evidence that Thomas was a principal in both the murder and the burglary such that his major participation in the crimes charged is not in doubt. Moreover, the evidence clearly shows his premeditated intent to murder Geist if he had to. There were, however, instructional errors in the "to convict" and accomplice liability instructions and in the aggravating factors special verdict form.

We hold that "to convict" instructions may be subjected to harmless error analysis to affirm convictions without aggravating circumstances. Thus, for purposes of Thomas's underlying convictions for first degree murder and residential burglary, we find that the errors in the "to convict" and accomplice liability instructions are harmless beyond a reasonable doubt. For purposes of affirming Thomas's conviction for aggravated first degree murder and his death sentence, we do not perform a harmless error analysis since to do so would violate the Supreme Court's holdings in

*Apprendi* and *Ring*. We therefore affirm Thomas's convictions for first degree murder and residential burglary, reverse his conviction for aggravated first degree murder and the death sentence, and remand for either a new trial on aggravated first degree murder or resentencing on first degree murder in accordance with this opinion.

## II. Other Alleged Grounds for Reversal of Convictions

### A. *Brady* Violation: *Brady v. Maryland*

Thomas insists that the State knew, but failed to disclose, that Rembert would not be testifying after the State outlined Rembert's testimony in its opening statement and that such a failure is a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). He contends that the trial court erred when it denied his subsequent motion for a mistrial and that his conviction and death sentence should be reversed. The State denies a *Brady* violation occurred.

In *Brady*, the Supreme Court held the prosecutor's suppression of an accomplice's confession to the murder violated the due process clause of the Fourteenth Amendment. *Id.* at 86. The rule announced was that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 916, 952 P.2d 116 (1998). In applying this "reasonable probability" standard, the question is whether the defendant received a fair trial without the evidence—that is, "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L.

Ed. 2d 490 (1995); *Benn*, 134 Wn.2d at 916. Accordingly, the reasonable probability of a different result is shown when the State's suppression "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. No *Brady* violation occurs if the defendant could have obtained the information himself through reasonable diligence. *Benn*, 134 Wn.2d at 916.

Here, the evidence—the knowledge that Rembert refused to testify—must have been requested by Thomas and material to his guilt or punishment for *Brady* to apply at all. The State closed its case without Rembert's testimony as he refused to testify. It is material only if knowing Rembert would not testify would make it reasonably probable that Thomas would have been found not guilty or not been sentenced to death. Thomas contends that Rembert's testimony was material to Thomas's guilt because the State had listed Rembert as a witness and informed Thomas that Rembert would be testifying pursuant to his plea agreement. The State's opening argument summarized that the evidence would show that Thomas shot Geist in the back of the head from the backseat of the van. At no time did the State allege that Rembert in particular would be testifying as to the events of the night. Thomas believes that the details of the murder and burglary that the State was allowed to present in opening argument, allegedly in reliance on Rembert's testimony, imprinted on the jurors' minds and were left unchallenged. Without Rembert's account of the night, Thomas contends that, based on the evidence adduced at trial, it was just as likely that Rembert shot Geist as it was that Thomas shot Geist.

In the first place, it is arguable that knowledge of whether or not a witness will testify can even be characterized as evidence at all. If it is, Thomas is confusing what evidence is subject to the materiality test. He begins by arguing that the *content* of Rembert's testimony was material and argues that the State received an unfair advantage by being able to discuss Rembert's potential testimony during opening arguments. To the contrary, to meet the

*Brady* test here, Thomas must persuasively argue that mere *knowledge of whether or not* Rembert would testify would have a reasonable probability of changing the outcome in the case. To that end, Thomas contends that, had he known Rembert would not be testifying, he would have moved for a mistrial earlier, "when it would more likely have been granted," changed his strategy for examining witnesses, "or developed the defense that the State was taking inconsistent positions on Rembert's complicity in the crime." Br. of Appellant at 112. He claims this is sufficient to violate *Brady* and CrR 4.7.

First, Thomas does not indicate that he requested the information and pursuant to CrR 4.7(a)(1)(i) the State's obligation is to provide a list of witnesses, not a guaranty of who will testify. Second, the tactical changes he claims he would have made had he known earlier that Rembert was not testifying are not part of the equation under *Brady*. The *Brady* test focuses on the evidence that was suppressed and its immediate effect on the outcome, in all reasonable probability. Thomas has not shown how his own knowledge of Rembert's refusal to testify would change the *jurors' minds* as to his guilt beyond noting that the State's comments as to the events of the night were allowed to be left unchallenged. However, Thomas did, in fact, seize his opportunity in his own closing argument to point out to the jury his contention that holes were left in the State's case without Rembert's testimony. Thus, the State's statements were not left unchallenged. Moreover, even if we do consider his potential tactical changes as the "evidence" in this *Brady* evaluation, Thomas has failed to show that any of those changes, with any reasonable probability, would lead to a different outcome in his case or that the outcome in his case is unreliable. As a note, the record reflects that Thomas was aware of the possibility that witnesses, especially codefendants, sometimes do not testify, even when it is part of their plea agreement.[4] We find no *Brady* violation

---

[4] In his objection to the admission of Rembert's excited utterance that Thomas shot Geist, which will be discussed in the following section of this opinion,

because Thomas has failed to show that the requirements of the *Brady* test have been met in his case.

B. Hearsay—Evidence Rule 803(a)(2): Excited Utterance

Thomas challenges the trial court's admission of Rembert's statement to Azevedo, "Des, he shot him. He shot him. He shot him in his head[,]" under the excited utterance exception to the hearsay rule. RP at 4815. The State defends the trial court's decision.

The reliability of hearsay testimony is presumed only where the statement contains particularized guaranties of trustworthiness. Statements falling within a firmly rooted hearsay exception are presumed to contain that guaranty of trustworthiness. *See State v. Crawford*, 147 Wn.2d 424, 434, 54 P.3d 656 (2002). The excited utterance hearsay exception is a firmly rooted exception to the hearsay rule. *State v. Woods*, 143 Wn.2d 561, 595, 23 P.3d 1046 (2001).

ER 803(a)(2) provides an exception to the hearsay rule for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *See State v. Hardy*, 133 Wn.2d 701, 714, 946 P.2d 1175 (1997) ("Excited utterances are spontaneous statements made while under the influence of external physical shock before the declarant has time to calm down enough to make a calculated statement based on self-interest."). Thus, there are three requirements: (1) a startling event or condition occurred (2) about which a statement was made by a declarant (3) while the declarant is still under the stress or excitement caused by the event. *Id.* "The crucial question in all cases is whether the statement was made while the declarant was still under the influence of the event to the extent that his statement could not be the result of fabrication, intervening actions, or the exercise of choice or

---

Thomas's counsel stated, "Mr. Rembert is a co-defendant who may not testify. I don't know that yet. My guess is, because they're trying to elicit this hearsay, that he is not." RP at 4817.

judgment." *Johnston v. Ohls*, 76 Wn.2d 398, 406, 457 P.2d 194 (1969). A trial court's determination that a statement falls within the excited utterance exception will not be disturbed absent an abuse of discretion. *State v. Davis*, 141 Wn.2d 798, 841, 10 P.3d 977 (2000). The trial court's ruling, therefore, will not be disturbed unless this court believes that no reasonable judge would have made the same ruling. *Woods*, 143 Wn.2d at 595-96.

Thomas contends that the trial court's ruling on this matter was an abuse of discretion and that Rembert's statement was not an excited utterance because Rembert had an opportunity to reflect and fabricate the statement and had a strong motive to shift blame to Thomas for the crime. He insists that too much time elapsed between the statement and the murder—that too many intervening events occurred—for Rembert to have been still under the stress of the murder when he told Azevedo that Thomas had shot Geist. Thomas cites *Davis*, 141 Wn.2d 798, and emphasizes that, there, a statement made within five to six minutes of fleeing the scene of the startling event was properly considered an excited utterance. Thomas distinguishes *Davis* based on the length of time that elapsed and the events that occurred between the murder and the statement and points out that Rembert did not flee the scene of the shooting. Instead, he helped dispose of the body and burglarize Geist's house, and traveled to Gig Harbor where the van was burned. These events totaled one and a half hours.

Conversely, the State points out that the passage of time, and hence *Davis*, is not dispositive in the determination of whether a statement is admissible as an excited utterance by citing cases in which the time elapsed since the startling event was not necessarily determinative. *See Woods*, 143 Wn.2d at 598-99 (statements made in response to paramedic's questions 45 minutes after the event were admissible); *see also Johnston*, 76 Wn.2d at 406 (statement may still be excited utterance even if made in response to a question).

██ Other cases include *State v. Flett*, 40 Wn. App. 277, 287, 699 P.2d 774 (1985), where a statement made seven hours after a rape was admissible due to a finding of "continuing stress" between the rape and the statement, and *State v. Strauss*, 119 Wn.2d 401, 416, 832 P.2d 78 (1992) where the statements of a child who had been raped, made three and a half hours after the rape, were admissible as excited utterances as the child was plainly distressed. *See also State v. Thomas*, 46 Wn. App. 280, 284, 730 P.2d 117 (1986) (not abuse of discretion to admit statement as excited utterance where statement made six to seven hours after event). Here, while an estimated one and a half hours elapsed between the murder and the statement to Azevedo, given the case law, this is not such a length of time as to preclude the admission of the statement.[5]

The circumstances at the time of Rembert's statement also support a finding that it was an excited utterance. Rembert was soaked in the victim's blood when he settled into Azevedo's car. He was present at the time of the murder and was visibly shaken, appearing "scared" and "frightened" when he made the statement according to his girl friend, Azevedo. RP at 4814. She testified that his legs and body were shaking and that he was cold to the touch. She had "never seen him like that before." *Id.* at 4868. Under the law, Rembert's statement has all the hallmarks of an excited utterance. We find no abuse of discretion and affirm the trial court's admission of Rembert's statement that Thomas had shot Geist as an excited utterance.

Thomas also argues for a rule that article I, section 22 of our state constitution requires exclusion of a codefendant's excited utterances in capital cases.

██ The admission of a statement at trial does not violate the confrontation clause of the United States Con-

---

[5] The dissent's difference of opinion is just that. The dissent cites no case authority which contradicts that cited by the majority. The dissent attempts to parse out the events of the evening into a series of neatly segregated crimes with different effects on the declarant for each. However, the dissent is not entitled to substitute its judgment for that of the trial court absent an abuse of discretion. There is none here.

stitution or article I, section 22 when the statement is endowed with adequate indicia of reliability. *Strauss*, 119 Wn.2d at 415. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). A statement that qualifies for admission under a " 'firmly rooted' hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability." *White v. Illinois*, 502 U.S. 346, 357, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992). As noted above, the excited utterance exception is a firmly rooted hearsay exception. Rembert's statement was properly admitted under the firmly rooted excited utterance exception, and is therefore reliable; it is immaterial that he was a codefendant. There has therefore been no violation of Thomas's confrontation rights.

## C. Exclusion/Admission of Evidence

██ ██ Whether excluding or admitting evidence at trial, this court reviews such decisions under the same standard of review: abuse of discretion. *State v. Swan*, 114 Wn.2d 613, 658, 790 P.2d 610 (1990); *Reese v. Stroh*, 128 Wn.2d 300, 310, 907 P.2d 282 (1995). Thus, the trial court's decision will be reversed only if no reasonable person would have decided the matter as the trial court did. *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997). Proper objection must be made at trial to perceived errors in admitting or excluding evidence and failure to do so precludes raising the issue on appeal. *State v. Guloy*, 104 Wn.2d 412, 421, 705 P.2d 1182 (1985).

### 1. "Other Suspect" Evidence Pertaining to Lynch

Thomas claims that he should have been able to cross-examine the police witnesses on "other suspect" evidence and been able to present certain results from Daryl Lynch's polygraph test. He contends that his rights to compulsory process and due process have been impinged. The State argues that it was sufficient for the court to have granted

Thomas the opportunity to question officers about who they arrested in their investigation.

 The Sixth Amendment provides, in part: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI. The federal right to compulsory process is applicable to the states through the Fourteenth Amendment. *Washington v. Texas*, 388 U.S. 14, 17-19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington*, 388 U.S. at 19; *State v. Smith*, 101 Wn.2d 36, 41, 677 P.2d 100 (1984).

 But both the Supreme Court and this court have noted that "[a]lthough guarded jealously, the right [to compulsory process] is not absolute." *Smith*, 101 Wn.2d at 41 (noting that *Washington* limited the right to compel witnesses to those witnesses who are material to the defense). In keeping with the right to establish a defense and its attendant limits, "a criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense." *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983). When there is no other evidence tending to connect another person with the crime, such as his bad character, his means or opportunity to commit the crime, or even his conviction of the crime, such other evidence is irrelevant to exculpate the accused. *See State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932); *State v. Maupin*, 128 Wn.2d 918, 925, 913 P.2d 808 (1996). Mere opportunity to commit the crime is not enough as such evidence is "the most remote kind of speculation." *Downs*, 168 Wash. at 668.

Evidence is relevant if it has any tendency to make any fact that is of consequence to the case more or less likely than without the evidence. ER 401. Relevant evidence is admissible unless its probative value is outweighed by prejudice or has a tendency to confuse the issues, mislead the jury, cause undue delay, or is an unnecessary presentation of cumulative evidence. ER 403.

### a. Walker's Identification of Lynch

 Thomas implies that the State was allowed to present evidence that the police initially suspected Lynch because Walker had identified Lynch in a photomontage, while Thomas was disallowed from cross-examining the investigating officers who testified on this matter.

Here, Lynch had an alibi for the night of the murder. Walker was certain the man driving the van was not Geist as he testified he saw a light-skinned African American male driving the van as he chased it from Geist's house (Geist was Caucasian). Walker also estimated that the man driving the van was larger and taller than Geist. This may have had a bearing on why Walker chose Lynch out of the montage since Lynch was a light-skinned African American, about six feet tall, and weighed 190-200 pounds. Thomas has these same characteristics. While he "identified" Lynch in a photomontage, Walker was uncertain whether Lynch was the man he saw. Walker testified that Lynch looked *most* like the person driving the van out of any of the other people pictured in the photomontage, however, no photo of Thomas was included. Thomas also neglects to point out that he cross-examined Walker at length on his identification of Lynch in the montage as well as Geist's mention that he may be meeting up with a man named Zaheed (Lynch) sometime in the evening of March 27, 1998. Thus, the record shows that Thomas was able to present evidence of Walker's identification of Lynch by Walker's own testimony. We therefore cannot agree that Thomas's right to present evidence was violated in regard to this issue.

### b. Coleman's Identification of Lynch

██ ██ The trial court granted the State's motion in limine to exclude Coleman's out of court identification of Lynch unless she were to testify at trial. The court clarified that Thomas could question officers as to who was arrested but not as to what the officer heard from Coleman. The trial court believed such testimony to be hearsay if not obtained directly from Coleman. On appeal, Thomas argues that he should have been permitted to cross-examine the police witnesses as to Coleman's identification of Lynch as the driver of a van she saw the night of the murder, without having to call Coleman as a witness.

Thomas's argument is not persuasive. First, Thomas did not object to the court's hearsay ruling. Second, he could have called Coleman herself, as he did with Walker, to testify as to what she saw the night of the murder, but he declined to do so. Therefore, Thomas has waived his hearsay objection and there was no infringement on his right to present evidence.

### c. Lynch's Suspected Motive

Thomas argues that Lynch owed money to Geist's mother, Hall, and that he had previously threatened her. He believes the court erred in denying him the opportunity to cross-examine police officers about Lynch's initial suspected motive for the crime and that the State opened the door to this evidence by discussing the investigation of Lynch.

The State moved in limine to exclude any reference to a phone conversation between Lynch and Hall. The State proffered that in January or February 1998, Hall contacted Lynch by phone regarding the final payment he owed her. Over the phone, Lynch allegedly responded with something to the effect of, "[d]on't fucking hassle me. I know where you live, and you will get your fucking money when I tell you." RP at 220. The State then stated that, after this phone call, Geist spoke with Lynch who agreed to pay Hall what was owed, less a transfer fee. This apparently resolved the dispute between Hall and Lynch. The trial court excluded testimony as to the phone call between Hall and Lynch.

██ The State's argument to the trial court and on this appeal is persuasive. Any exchange as between Lynch and Hall bears no relevance as to the existence or nonexistence of a disagreement between Lynch and Geist. Thomas has not shown that conversations between Hall and Lynch are relevant to showing Lynch had a motive to murder Geist, especially when any disagreement between Lynch and Hall had been resolved two to three months before the murder. On the day of the murder, Lynch owed Hall only $144. The investigating officers' mere mention of Lynch as an initial suspect at the beginning of the murder investigation does not suffice to open the door to cross-examination as to Lynch's possible motive to kill Geist.

### d. Lynch's Polygraph Results

██ ██ Thomas's argument that he should have been allowed to present evidence that Lynch showed deception in his polygraph is not well taken. Results of polygraph tests are not recognized in Washington as reliable evidence and are, in fact, inadmissible without stipulation from both parties. *State v. Renfro*, 96 Wn.2d 902, 905, 639 P.2d 737 (1982). Thus, the fact that Lynch showed deception in questions during the test does not, by itself, make the results admissible. Given the dearth of additional evidence inculpating Lynch in the murder, and given the inadmissibility of polygraph results, there is no basis for an exception here.

Thus, in regard to whether Thomas's right to present evidence was violated, Thomas speculates only that the testimony from the police officers who initially investigated Lynch would inculpate Lynch as a potential suspect. In reality, there is no evidence suggesting that the dismissal of Lynch as a suspect was anything but rational and supported by the weight of the evidence. Recall the testimony of Ducharme and Azevedo that chronicled Thomas's and Rembert's presence with Geist prior to the murder and their presence after the estimated time of the murder at Geist's house and in his van. There was also Thomas's acquaintance, Horyst, who testified that Thomas solicited

him to help Thomas rob his boss two weeks before the murder. During that conversation, as well as others, Thomas expressed that his boss may have to be killed.

We hold that the trial court did not abuse its discretion in limiting the evidence to that which was relevant to the consideration at issue by excluding "other suspect" evidence and polygraph evidence pertaining to Lynch when each was at once irrelevant and unreliable.

### 2. Exclusion of Evidence of Adams's Alleged Bias

Thomas asserts that his right to confront witnesses was violated by the trial court's exclusion of cross-examination of Adams, who tape-recorded Horyst and elicited his recount of Geist's murder and Thomas's involvement in it. Thomas argues he should have been allowed to present evidence (1) that Adams initially contacted police to offer a trade of information about an unsolved murder for leniency in drug charges pending against him and (2) that Adams wore a body wire to record the conversation with Horyst as part of a plea agreement with the State.

The State moved in limine to exclude evidence of Adams's plea agreement as irrelevant. The State clarified that it would not be calling Adams to testify; rather, Horyst would be testifying. Thomas agreed that Horyst would not be allowed to testify as to any hearsay statements made by Adams and that Adams's plea agreement was irrelevant unless Thomas called him as a witness. Thus, the court ruled that no reference would be made to Adams's plea agreement unless he was later called as a witness,[6] which neither side did.

---

[6] An apparent scrivener's error was made in the written ruling on this motion in limine. While the court's oral ruling was that Thomas would *not* be precluded from referencing Adams's plea agreement should he choose to call Adams as a witness, the written ruling read, "[t]he defense is prohibited from referencing the plea agreement should the defense call Adams as a witness." CP at 876. The record indicates however that, at a subsequent hearing, the prosecutor clarified her understanding that the oral ruling was in fact the correct ruling. Comments by the defense counsel later in trial also indicate that this was his understanding as well.

Thomas was the only one who referenced Adams's plea agreement when he objected to the State's question to Detective Webb: "[w]hat, if anything, did Mr. Adams want in exchange for his help in this case?" RP at 4762. In the objection, defense counsel stated, "[o]bjection, Your Honor, irrelevant. The Court has ruled pretrial that we can't even go into any agreements of Mr. Adams unless he's called as a witness. He's not been . . . and won't be." RP at 4762. The State withdrew the question. Thomas's argument on appeal, then, is disingenuous. The State is correct that the jury did not hear evidence about Adams's plea agreement because Thomas objected to its admission in the first place and objected to it at trial.

Thomas maintains, however, that Detective Webb's testimony on direct revealed hearsay statements made to him from Adams to the effect that Adams knew who killed Geist. Thomas argues that admission of these hearsay statements as "preliminary," to which Thomas objected, made Adams a witness against Thomas, thereby allowing him to subject Adams's statements to impeachment for motive and bias, just as they would be had Adams testified as a witness at trial. Had he been given the opportunity, Thomas argues he would have pointed out that he never told Horyst that he had killed Geist or that Horyst had ever told Adams that Thomas had killed Geist. Thus, he argues that the trial court erred in disallowing him to put on evidence of Adams's motive to lie or his bias, i.e., his plea agreement.

 Detective Webb mentioned Adams in the context of explaining how suspicion shifted to Thomas during the investigation. Thus, it is arguable whether this statement by Adams was hearsay at all—i.e., that it was being offered to prove the truth of the matter asserted. Also, since the record does not reflect that Thomas ever sought to introduce evidence of Adams's bias pursuant to ER 806, either through Detective Webb or otherwise, this claim was not preserved for appeal. *See State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995).

### 3. Admission of Detective Webb's Testimony Regarding Lynch's Alibi

Thomas argues that Detective Webb was permitted to testify about Lynch's mother's and roommate's statements as to Lynch's whereabouts on the night of the murder and that someone using Lynch's personal identification number (PIN) entered West Top Credit Union, an establishment with which Lynch had a cleaning contract to clean it every Friday night.

Detective Webb testified that he contacted these people in order to verify Lynch's alibi. Webb also testified to the use of Lynch's PIN at the credit union. Thomas's hearsay objection to this latter testimony was overruled. At no time, however, did Webb testify as to *statements* made by these parties; as such, the hearsay rules are not applicable. We find there was no abuse of discretion in allowing Webb to testify as to the course of his investigation because he elicited no hearsay testimony.

### 4. Exclusion of Evidence of Horyst's Drug Use

Thomas argues that evidence showing Horyst was using drugs regularly at the time of the intercepted conversation he had with Adams was relevant and should not have been excluded.

"It is well settled in Washington that evidence of drug use is admissible to impeach the credibility of a witness if there is a showing that the witness was using or was influenced by the drugs at the time of the occurrence which is the subject of the testimony." *State v. Russell*, 125 Wn.2d 24, 83, 882 P.2d 747 (1994).

When asked by the court, Thomas admitted to having "[n]othing concrete" in the way of evidence showing Horyst was under the influence of drugs the day he had the conversation with Adams. RP at 399. The trial court ruled that Thomas would not be allowed to question Horyst about his drug usage during the deposition but that it would reconsider the issue at trial if Thomas had more evidence

then. Horyst did testify at trial and the record does not show, nor does Thomas allege, that he sought to introduce better evidence of Horyst's drug usage than he had during pretrial. Thomas has not pointed to any new evidence discovered since trial that indicates Horyst was using drugs on the day of or even during his conversation with Adams. Again, Thomas is raising a disingenuous argument on appeal. We find no abuse of discretion.

### 5. Admission of Testimony of Ducharme's Friends

At trial, the court permitted Ducharme to testify as to what she had told her friends about the murder and burglary and how Thomas was involved. The court also permitted Ducharme's friends, Alexandra Wright and Marcy Robinson, to testify as to what she had told them about the night of the murder. The court's rationale for allowing the friends to testify as to what Ducharme said was that it was evidence of a prior consistent statement offered to rebut a claim of recent fabrication pursuant to ER 801(d)(1)(ii).

First, Thomas argues that his cross-examination of Ducharme did not rise to the level of an expressed or implied claim that Ducharme had recently fabricated her story; therefore, ER 801(d)(1)(ii) was not triggered. Second, he argues that Ducharme had a motive to fabricate her story in order to shift blame to Thomas. Third, if the testimony of Ducharme's friends was admissible, Thomas argues that it was unnecessary as Ducharme's testimony would have been sufficient.

ER 801(d)(1)(ii) provides that a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is . . . (ii) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . .

If there is an inference raised in cross-examination that the witness changed her story in response to an external pressure, then whether that witness gave the same account of the story prior to the onset of the external pressure becomes highly probative of the veracity of the witness's story given while testifying. *State v. McDaniel*, 37 Wn. App. 768, 771, 683 P.2d 231 (1984) (same rule cited with approval in *State v. Purdom*, 106 Wn.2d 745, 750, 725 P.2d 622 (1986)). Accordingly, the proponent of the testimony must show that the witness's prior consistent statement was made *before* the witness's motive to fabricate arose in order to show the testimony's veracity and for ER 801(d)(1)(ii) to apply. *McDaniel*, 37 Wn. App. at 771.

During cross-examination of Ducharme, defense counsel began questioning with:

Q (By [Defense Counsel]) The agreement you worked out if you testified in this case, it was that you would be charged with robbery in the first degree. The State would recommend 48 months in prison. You would also be charged with rendering criminal assistance in the first degree. They would recommend 14 months to run concurrent, meaning that it wouldn't be added to the 48. It gets run together. Is that how you understood it?

A Yes.

Q It also says that the State has no objection to a defense plea to the sentencing judge for the low end of the range, which is 36 months. So your attorney can argue to the judge that you receive a sentence of 36 months?

A Yes.

Q Which is also a possibility in this case?

A Yes.

. . . .

Q So you would have what, about four more months to go?

A Right.

Q Given what you were charged with, aggravated murder in the first degree, the penalties for that are life without the possibility of parole?

A Yes.

Q And the death penalty?

A Right.

Q So getting out in possibly as little as four months is certainly better than never getting out?

A Right.

Q Better than being hanged, isn't it?

A Yes.

RP at 3862-64. The next set of questions regarded Ducharme's divorce from Thomas that enabled her to testify against him. Thomas then asked about Ducharme's first interview with police on March 30, 1998, and pointed out both consistencies and inconsistencies in her statements between this initial interview and the one on January 26, 1999.

Thomas alleges that he was merely trying to establish that Ducharme's statements to police were inconsistent with each other and with her testimony on direct at trial. Thomas rebuts his own argument with his explanation of the cross-examination—he was, by his own admission, trying to show her testimony was changed. The portion from the cross-examination above strongly suggests that Thomas was trying to show Ducharme may have had motive to change her story in order to receive a plea agreement for testifying against Thomas.[7] If not an express claim of recent fabrication it was certainly implied. Thus, ER 801(d)(1)(ii) was triggered.

 Apparently anticipating that result, Thomas's next argument is that Ducharme had motive to change her story in order to shift the blame to Thomas and minimize her involvement. Whether she had motive to do so and how much weight was to be given that determination was properly left within the auspices of the jury. The tool for doing so, once the claim was made by Thomas, was to allow

---

[7] In fact, at various times during voir dire Thomas reiterated his concern with whether people who enter into plea agreements have a motive to lie by questioning jurors as to their thoughts on "snitches." RP at 2257-58, 2285-87, 2340-41.

hearsay testimony by her friends indicating that the story Ducharme told police in January 1999 was the same as the story she told her friends in August 1998, long before striking any plea agreement with the State.

Finally, Thomas contends that if the testimony of Ducharme's friends were admissible, it were unnecessary as Ducharme's testimony would have been sufficient. Evidence that a witness repeatedly told the same story is not admissible to corroborate her testimony, *unless* the defense attacks her credibility by suggesting her fabrication of the story or motive to lie. *State v. Alexander*, 64 Wn. App. 147, 152, 822 P.2d 1250 (1992) (citing *Thomas v. French*, 99 Wn.2d 95, 659 P.2d 1097 (1983)). "This is because 'repetition is not generally a valid test for veracity.' " *Id.* (quoting *State v. Harper*, 35 Wn. App. 855, 857, 670 P.2d 296 (1983)).

Here, though, Thomas *did* challenge Ducharme's credibility. Allowing only Ducharme's testimony would not have been sufficient since her story at trial is precisely what Thomas was attempting to undermine. The allegation of motive and fabrication having been made, the State was then allowed, pursuant to ER 801(d)(1)(ii), to rebut that allegation. And, in essence, Thomas set himself up for it by alleging motive and fabrication in the first place. Nothing in the rules prohibits the prior consistent statements that the trial court allowed.

III. Pro Se Arguments

Preliminarily, former RAP 10.3(d) (1998) provides that a defendant's pro se supplemental brief "should be limited to those matters which defendant/appellant believes have not been adequately covered by the brief filed by the defendant/appellant's counsel." Because we reverse Thomas's death sentence, we will address only those pro se arguments pertaining to his convictions that have not already been raised by his appellate counsel.

A. Spousal Privilege

Thomas asserts that his constitutional rights were violated by Ducharme's plea agreement with the State that required her to divorce Thomas. He continues, conversations between himself and Ducharme should not have been admissible at trial and points out that in January 1999, when Ducharme was questioned by police, they were still married. The State contends that Thomas did not preserve the spousal privilege issue for appeal. The State also argues that the conversations between Ducharme and Thomas to which she testified occurred prior to their marriage in August 1998 and are therefore not eligible for the spousal privilege.

 Communications between spouses during marriage are privileged, may not be revealed by either spouse without the consent of the other, and remain privileged both during and after the marriage. RCW 5.60.060(1). Thomas does not specify the portions of Ducharme's testimony where she discussed conversations that occurred during their marriage. Thomas incorrectly focuses on when Ducharme was questioned rather than when the communications between herself and Thomas occurred. The privilege applies only to the latter if made during marriage. At trial, Ducharme testified to conversations with Thomas that occurred prior to the date of the murder, March 27, 1998, which in turn was prior to their marriage in August 1998. Thus, the conversations are not privileged. There was no abuse of discretion in allowing Ducharme to testify as to the content of conversations between herself and Thomas that occurred prior to their marriage.

 As for whether Thomas preserved for appeal the issue of whether his constitutional rights were violated by Ducharme's plea agreement, contrary to the State's assertion, Thomas need not have expressly objected at trial for this court to review this issue on appeal as trial errors implicating constitutional rights may be raised for the first time on appeal. *See* RAP 2.5(a). However, this court will not review issues for which inadequate argument has been

briefed or only passing treatment has been made. *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992); *Olson*, 126 Wn.2d at 321. Here, Thomas has not specified with any particularity which of his constitutional rights has been violated and makes no argument on the issue, nor does he cite any authority. Accordingly, we decline review of whether Ducharme's plea agreement, requiring her to divorce Thomas, violated any of Thomas's constitutional rights.

## B. Testimony of Cool

Thomas argues that the trial court abused its discretion in allowing Cool to testify that he could tell the race of the individual in the back of the van by his voice. Thomas believes this made race an issue in his trial and was highly prejudicial. The State responds that Thomas has not preserved this issue for appeal since he failed to renew his objection. Upon Thomas's initial objection, the trial court allowed the prosecution to question Cool on this matter after a proper foundation had been laid. Cool responded that he believed the person in the back of the van, who he never saw, was a black man.

The State is correct that Thomas did not renew his objection to this questioning after the prosecution laid the foundation. An issue is not preserved for appeal unless proper and particularized objection was made at the time of the ruling. ER 103; RAP 2.5(a); *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993). Thomas has not shown a manifest constitutional error in the admission of this testimony. Because this issue has not been preserved for appeal, we also decline its review.

## C. Admission/Exclusion of Evidence

The admission or exclusion of evidence is in the discretion of the trial court. *Swan*, 114 Wn.2d at 658. Such decision will be upheld absent an abuse of discretion, which may be found only when no reasonable person would have decided the same way. *Castellanos*, 132 Wn.2d at 97; *Reese*, 128

Wn.2d at 310. Rules of relevancy guide the trial court in admitting or excluding evidence. *See* ER 401. Relevant evidence is admissible unless its potential for prejudice substantially outweighs its probative value. ER 403.

### 1. Testimony Regarding Type of Gun

Thomas challenges the testimony of Jody Ludwig and Megan Wilson that they heard several gunshots around 10:00 P.M. on March 27, 1998. He disagrees with allowing them to testify whether they could discern if the shots were fired from a shotgun or handgun because their opinions were speculative and lacked a sufficient foundation. The State argues that there was no error in allowing their testimony.

Both Ludwig and Wilson thought the shots sounded like they were shot from a handgun, based on their individual experiences with the sounds of shotguns and handguns. Thomas has not articulated how their testimony was so prejudicial as to outweigh its probative value or how the foundation for such testimony was insufficient. As such, we find no abuse of discretion.

### 2. Testimony Regarding Geist as a Boss

Thomas contends it was error to allow Natasha Anthony, one of Geist's employees, to testify during the guilt phase as to the type of boss Geist was and that it deprived him of a fair trial. Thomas's objection to this testimony as irrelevant was overruled. The State argues that such evidence was relevant because the State was trying to explain Geist's role as an employer since this was a murder for payroll money. The State contends that her testimony answers "the jury's question of defendant's possible motive (e.g., was Richard Geist perceived as a poor boss)." Resp. to Pro Se Suppl. Br. at 7. At the close of the State's examination of Anthony, it asked, "[w]hat sort of boss was Richard Geist?" RP at 4318. Anthony responded that Geist was a "really good boss," "reasonable" and a "nice guy." RP at 4318.

Thomas is probably correct that the relevancy of this information is questionable, although it arguably does clarify that Thomas's motive for killing Geist was not likely to have been because Geist was an unsavory employer. Even if irrelevant, however, we need not reverse Thomas's convictions on that basis.

We will not reverse due to an error in admitting evidence that does not result in prejudice to the defendant. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). Where the error is from violation of an evidentiary rule rather than a constitutional mandate, we do not apply the more stringent " 'harmless error beyond a reasonable doubt' " standard. *Id.* Instead, we apply "the rule that error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981). "The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." *Bourgeois*, 133 Wn.2d at 403.

Thomas has not made a convincing argument that Anthony's comment was so prejudicial that, within reasonable probabilities, the outcome of his trial would have been different had Anthony not been allowed to answer the State's question. Given the total evidence, any error in allowing these comments would be of minor significance to the outcome here.

### 3. Admission of Vial of Blood

Thomas next challenges the trial court's admission of a vial of Geist's blood as irrelevant and unduly prejudicial. He presents no argument on this issue. Thomas's objection to this evidence was overruled with a finding from the court that this evidence was no worse than the pictures of Geist's body that were admitted. Given Thomas's lack of argument and showing of prejudice, we find no abuse of discretion in admitting this forensic evidence.

### 4. Webb's Testimony Regarding Thomas's Complexion

Thomas challenges the trial court's admission of Detective Webb's testimony that Thomas's complexion was more fair at the time of trial than it was when first contacted by police in March 1998. Thomas asserts that this testimony unnecessarily made race an issue in his trial when the shade of his skin was not relevant. The State disagrees and argues that *identity* was at issue and points out that there was testimony from Walker that he saw a "light-skinned African American" male driving Geist's van as he chased it the night of the murder as well as " 'other suspect' evidence" regarding Lynch. Resp. to Pro Se Suppl. Br. at 9; *see* RP at 4169, 4248.

■■■ Thus, the State asked Webb for his impression as to what Thomas's complexion was like at the time of trial versus in March 1998. In response to Thomas's objection to relevance and speculation, the State argued that "Thomas has been in custody for a long time and he is very pale. And the jury has a right to know that in March of 1998, [Thomas] appeared more of a light-skinned black male than he does now. He looks very light and white." RP at 4751. Webb described both Lynch and Thomas as being light-skinned African Americans. Given Walker's identification and the fact that Lynch had been ruled out as a viable suspect in the murder, whether Thomas's complexion matched the description given by Walker became relevant. Moreover, Thomas did not make an objection based on prejudice at trial. We find no abuse of discretion in allowing this testimony.

### 5. Azevedo's Identification of Rembert from Photograph

Thomas argues that Azevedo should not have been allowed to identify Rembert from a photograph during trial. He contends that the State was seeking to introduce the photograph only "to remind the jurors that both Rembert and I were black, our girlfriends were both white, and the victim was white," which made race an issue in the trial. Appellant's Pro Se Br. at 7. The State argues that Thomas

has not preserved the issue of whether the photo unfairly brought race to the forefront of his trial since that was not the ground upon which he objected at trial.

 The basis for the objection actually made at trial was a lack of foundation for the photograph, which was overruled because Azevedo testified that the photo accurately portrayed how Rembert appeared in March 1998. The State is correct that Thomas has not preserved the issue of whether the photograph injected race into the trial. We find that Thomas has waived this issue on appeal.

### D. Admonishment to Trial Spectators

On two occasions, the trial court admonished trial spectators to refrain from particular conduct. Thomas argues that his convictions should be overturned because certain spectators' conduct prejudiced the jury, denying him a fair trial. He also contends that the trial court should not have admonished the spectators in the presence of the jury since that only further emphasized the conduct.

In the presence of the jury, the trial court told those in the gallery: "do not make comments, do not make gestures, do not say anything that might influence the jury. If I see this or I hear this, I will have you removed." RP at 4559. Later in the trial, the court was made aware that Geist's mother had a framed photograph of him with her in the courtroom. There was no allegation that the jury had seen the photograph; in fact, Hall had kept the photo inside her jacket. In response to this, outside the presence of the jury, the court again admonished the gallery to refrain from gesturing and remarking on the case so that the jury could remain uninfluenced by such conduct.

 The court was trying to minimize prejudice to Thomas's case by cautioning the spectators regarding the ramifications of their actions. As to the first admonishment, no particular gesture or remark was described, nor was an individual spectator singled out. Thomas has made no showing of prejudice. While Thomas alleges prejudice as to the first admonishment, he makes no argument as to why

the second admonishment was prejudicial or that the jury saw the photo. As noted above, the record does not reflect that the jury saw the photograph. We hold there was no error in the trial court's admonishments to the spectators.

### E. Allocution before Closing Argument

■ Thomas argues that the trial court erred in granting the State's request that he make his allocution prior to closing arguments over his objection. He contends that the court also erred when it gave the State the option of commenting on Thomas's allocution comments during its closing argument. Thomas conceded at trial that this matter was in the discretion of the trial court and was unable to cite any authority for his request.[8] Thomas points to no such authority in his argument to this court either. Without argument or authority to support it, an assignment of error is waived. *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986). Accordingly, we find no abuse of discretion in the trial court allowing the State to comment on Thomas's allocution during closing argument.

### F. Sufficiency of the Evidence—Possession of Firearm Conviction

■ Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.* Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Credibility determinations are for the trier of fact and are not subject to review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). This court must defer to the trier of fact on issues of conflicting testimony, credibility of

---

[8] The court asked Thomas to brief the matter with citation to authority. Thomas makes no showing that such briefing was supplied to the trial court.

witnesses, and the persuasiveness of the evidence. *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985).

Thomas contends that the State failed to prove, beyond a reasonable doubt, that he unlawfully possessed a firearm. To convict Thomas of unlawful possession of a firearm in the first degree, the jury had to find each of the following elements proved beyond a reasonable doubt:

(1) That on or about the 27th day of March, 1998, the defendant owned a firearm or had a firearm in his possession or control;

(2) That the defendant had previously been convicted of Residential Burglary, which is a serious offense; and

(3) That the ownership or possession or control of the firearm occurred in the State of Washington.

CP at 1483. There is extensive evidence and testimony tying Thomas to the events of March 27, 1998, including the murder of Geist. Horyst testified that he had seen Thomas with a .38 caliber, wooden-handled revolver at the time Thomas solicited Horyst's help in robbing Geist. Horyst also testified that Thomas admitted that he (Thomas) may have to kill Geist. In addition to Horyst, Thomas had also described to Ducharme his plan to rob and maybe shoot Geist. Ducharme also testified that she had often seen Thomas with a gun during the time period surrounding the night of the murder, although not on that particular night. She described the gun as a ".35 revolver long barrel" although she was not sure of the caliber. RP at 3807. Ducharme did not see Thomas with this gun again after the night of the murder; Thomas had also told her that he had gotten rid of the gun later on March 27, 1998, after the murder. Looking at this evidence in a light most favorable to the State, and all reasonable inferences thereof, there is sufficient evidence to indicate that "on or about" March 27, 1998, Thomas owned a firearm or had one "in his possession or control." We therefore affirm the jury's guilty verdict for first degree unlawful possession of a firearm.

## CONCLUSION

We affirm Covell Paul Thomas's conviction in the Pierce County Superior Court for the first degree murder of Richard Geist and his convictions for residential burglary and first degree unlawful possession of a firearm. We agree with Thomas that the "to convict" jury instruction and the aggravating factors special verdict form given in his case did not require the jury to find that Thomas in particular had the intent to murder Geist or that the aggravating factors specifically applied to him as opposed to his accomplice. We hold we are unable to subject these instructional errors to a harmless error analysis for purposes of upholding a death sentence because to do so would be to find facts that increase the sentence beyond the statutory maximum. These facts must be found by the jury. We reverse Thomas's conviction for aggravated first degree murder and must reverse his death sentence. We find, however, that the errors in the accomplice liability and "to convict" instructions were harmless beyond a reasonable doubt for purposes of upholding Thomas's underlying convictions for first degree murder and residential burglary. Therefore, we remand for either a new trial on the aggravating factors or resentencing in accordance with this opinion.

ALEXANDER, C.J., and BRIDGE, OWENS, and FAIRHURST, JJ., concur.

CHAMBERS, J. (concurring) — I concur with the result reached by the majority on the grounds that, under *Tison v. Arizona*, 481 U.S. 137, 158, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987), the State bears the burden of proving Covell Thomas was a major participant in the crime before the death penalty may be imposed. *See also State v. Roberts*, 142 Wn.2d 471, 503-04, 14 P.3d 713 (2000). Instructional error relieved the State of this burden, and therefore, the death penalty must be vacated. However, instructional error in a "to convict" instruction may be harmless. *See State v. Brown*, 147 Wn.2d 330, 338-39, 58 P.3d 889 (2002). I concur

with the majority that under the facts of this case, that error was harmless, and join in affirming Thomas's first degree murder conviction.

MADSEN, J. (concurring/dissenting) — I write separately to express my disagreement with the majority's conclusion that Edward Rembert's hearsay statement was properly admitted as an excited utterance. The statement does not qualify as an excited utterance, and its admission violated Covell Thomas's confrontation clause rights as well as ER 802.

## ANALYSIS

The hearsay rule, ER 802, generally excludes hearsay from being introduced as evidence because cross-examination is the best vehicle for determining whether a witness is providing trustworthy testimony. *State v. Chapin*, 118 Wn.2d 681, 685, 826 P.2d 194 (1992). Reliability may otherwise be established as demonstrated by the numerous exceptions to the rule. *Id.* One exception to the hearsay rule is the excited utterance, which is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). The exception is based on the idea that " 'under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control.' " *Chapin*, 118 Wn.2d at 686 (quoting 6 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1747, at 195 (James H. Chadbourn rev. ed. 1976)). The utterance is believed to be a " 'response to the actual sensations and perceptions already produced by the external shock' " rather than based on reflection or self-interest. *Id.*

The excited utterance is a firmly rooted hearsay exception, considered to be so trustworthy that cross-examination is expected to add little to its reliability. *Chapin*, 118 Wn.2d at 685-86 (citing *White v. Illinois*, 502 U.S. 346, 357, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992)); *State v. Woods*, 143

Wn.2d 561, 595, 23 P.3d 1046 (2001). If a statement is admissible as an excited utterance, it bears adequate indicia of reliability such that its admission does not violate the confrontation clause. *White*, 502 U.S. at 356 n.8; *State v. Davis*, 141 Wn.2d 798, 846, 10 P.3d 977 (2000); *State v. Palomo*, 113 Wn.2d 789, 797, 783 P.2d 575 (1989); *see Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980).

Three conditions must be satisfied for a statement to fall within the excited utterance exception to the hearsay rule: (1) A startling event or condition must have occurred, (2) the statement must have been made while the speaker was under the stress of the excitement caused by the startling event or condition, and (3) the utterance must relate to the startling event or condition. *Woods*, 143 Wn.2d at 597; *Chapin*, 118 Wn.2d at 686-88.

Here, as they drove away after the van was set on fire, Rembert said to his girl friend Desiree Azevedo that Thomas shot Richard Geist: "Des, he shot him. He shot him. He shot him in his head." Verbatim Report of Proceedings at 4868. At the time, according to Ms. Azevedo's testimony, Rembert appeared scared and was shaking, his leg was cold to the touch, and a tear fell down his face. She had never seen him like this. This evidence establishes that Rembert was upset when he made the statement.

However, according to the State's evidence and theory of the case, this statement was made only *after* the shooting, *after* Rembert helped Thomas remove Mr. Geist's body from the van, *after* they returned to Geist's residence, *after* they illegally entered and ransacked Geist's home in a search for money—during which Rembert waited quietly when a friend of Geist's, Mr. Walker, knocked on the door and then waited until Walker left, *after* Rembert received money from Thomas for his participation, *after* they met up with Ms. Azevedo and Thomas's girl friend Lynette Ducharme and talked, *after* following the women from Tacoma to a place in Gig Harbor, and *after* the van was destroyed to hide incriminating evidence. Some one and one-half to two hours

had passed from the time of the murder to the time the statements were made, with Rembert engaged in considerable criminal activity during that time that required thought and reflection, some of which was designed to prevent the police from discovering his identity.

Under these circumstances, the second requirement for an excited utterance is lacking. This requirement is that " ' "the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." ' " *State v. Brown*, 127 Wn.2d 749, 758-59, 903 P.2d 459 (1995) (alteration in original) (quoting *State v. Strauss*, 119 Wn.2d 401, 416, 832 P.2d 78 (1992) (quoting *Johnston v. Ohls*, 76 Wn.2d 398, 406, 457 P.2d 194 (1969))). "The second element 'constitutes the essence of the rule' and '[t]he key to the second element is spontaneity.' " *State v. Lawrence*, 108 Wn. App. 226, 234, 31 P.3d 1198 (2001) (quoting *Chapin*, 118 Wn.2d at 687-88), *review denied*, 145 Wn.2d 1037, 43 P.3d 21 (2002). Simply because Rembert appeared upset at the time the statements were made does not mean they come within the excited utterance exception. For example, in *Brown*, the victim was a prostitute who was allegedly raped by several men after she voluntarily went to an apartment to engage in sexual activity with one man. Prior to calling 911, she fabricated part of her story to appear more sympathetic to police, saying that she had been abducted and taken to the apartment. This court held that her statements to 911 did not qualify as an excited utterance. Not only did she have the time to fabricate, she actually did so in part.

Here, as in *Brown*, there was considerable opportunity and motive for Rembert's statement to be fabricated or made in the exercise of choice and judgment. He had ample time to reflect on all the events of the night, at the least during the drive from Tacoma to Gig Harbor. There is no evidence he ever sought to disassociate himself from the night's activities, and no indication he was other than a

willing participant in the subsequent burglary of Geist's residence. He had strong motivation to distance himself from the shooting as much as possible and place as much blame on Thomas as possible. He also could have wanted his girl friend to believe that Thomas, not he, actually shot Geist.

The point here is not whether Rembert was upset or distressed when he made the statement. It is, in the ultimate sense, whether the statement he made, in light of all the surrounding events and circumstances, may be said to be so inherently reliable and trustworthy as to be admissible without the benefit of the opportunity for cross-examination. This is, as noted, the foundation for the excited utterance exception. Here, there is too great a passage of time, too many intervening events, too much evidence that Rembert was a willing participant who con-sciously sought to conceal his participation, and too strong a motive to fabricate or alter the story for a court to accept that Rembert's statements were sufficiently spontaneous to constitute an excited utterance. Accordingly, it cannot be said to be inherently reliable and trustworthy.

I would hold that the trial court abused its discretion in admitting the statement as an excited utterance, and would hold that as a result, Thomas's right to confront the witnesses against him was violated, as well as ER 802.

JOHNSON and SANDERS, JJ., concur with MADSEN, J.