2016 OCT 10 AM 9: 39


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 73296-0-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| GILJON LEE-SEAN JOHNSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: October 10, 2016 |

LEACH, J. — Giljon Lee-Sean Johnson appeals from his conviction for residential burglary. He challenges the sufficiency of the evidence to support his conviction. But the State presented evidence establishing that Johnson either unlawfully entered the residence with the intent to commit a crime or facilitated the commission of the crime by carrying stolen items away from the house. Thus, sufficient evidence supports Johnson's conviction, either as a principal or as an accomplice. Based on Johnson's age, the length of his sentence, and his employment history, we decline his request to deny appellate costs to the State. We affirm.

## FACTS

At about 1:00 a.m. on July 19, 2014, Eric Hull had just turned out the lights to go to sleep in his south Seattle home when he heard a loud "scraping or grinding" noise outside. Hull looked out of the second-floor bedroom window into the backyard and side yard of his neighbors' house at 4016 39th Avenue South. He saw no lights on in

the house and knew that the residents, Katherine Francis and Mark Cuthebert, were traveling out of the country. The backyard was also dark, but Hull could see the light from two flashlights and heard voices from "at least" two people.

Hull went downstairs and called 911. While speaking to the operator, Hull described seeing flashlights inside several rooms of the house and in the basement. Hull estimated that he heard the police arrive and announce themselves within five minutes of the 911 call. Hull then heard the sounds of a scuffle, what sounded like items being dropped, and an officer announcing that one of the suspects was in custody. Hull later saw "a lot of flashlights" trained on the roof of a detached garage behind the neighbors' backyard.

Seattle Police Officer Terry Persun responded to the 911 call and approached the front of the Francis/Cuthebert house on foot with Officer Lee. Through a front window, Persun saw a man inside with a flashlight. The man was wearing gloves and carrying a flat-screen television. Persun did not get a good look at the man's face.

While looking through the window, Persun heard a "huge noise" at the back of the house and what sounded like "ten people running" in the fenced side yard on the north side of the house. Officer Lee announced the officers' presence, and Persun immediately heard "whoever it was running . . . basically stop, turnaround, and then just run in the opposite direction away from us." Persun and Lee then opened the gate at

the northwest corner of the property and followed the suspects into the backyard. Persun estimated that no more than five to seven minutes had elapsed since he arrived.

In the northeast corner of the backyard, Persun saw a man attempting to hide under some bushes. Persun arrested the man, later identified as Queshawn Maxwell. A pair of purple gloves lay on the ground nearby.

Officers Andrew Wilkes and Andrew Belgarde approached the front of the house about the same time as Persun and Lee. Wilkes saw two people inside carrying flashlights and moving around. When asked how many flashlights he saw inside, Belgarde replied, "I didn't get a good count. But it was more than two. So there was quite a few flash lights inside." Belgarde added that he was not "100 percent sure," but "I know I saw two, three." Based on the flashlights and the noise inside, Belgarde "guesstimated" there were "three or four, maybe five people" inside. He acknowledged that he tended to "over-estimate" in such situations to avoid surprises.

While other officers went around the north side of the house, Wilkes and Belgrade went around to the south side yard. Almost immediately, Wilkes arrested a young man, later identified as Lamondo Williams, as he fell out of a window. Williams was wearing a pair of purple gloves and not carrying any items.

After ascertaining that Wilkes had Williams under control, Belgarde kicked through the side yard fence to assist the other officers in the backyard. Belgarde saw

the officers near the northeast corner of the backyard attempting to take Maxwell into custody. Belgarde then heard a third suspect, later identified as appellant Johnson, running through the bushes toward the southeast corner of the backyard.

Officer Benjamin Kelly parked his patrol car on Cascadia Avenue, the street directly to the east of 39th Avenue South. He then walked toward a fence at the rear of a house on Cascadia that bordered the Francis/Cuthebert backyard. Kelly heard a lot of noise on the other side of the fence but could not see anything. Kelly thought someone was repeatedly running up against the fence and trying to climb over it.

A short time later, Kelly saw Johnson attempting to conceal himself in a small gap between a detached garage and a fence. When Kelly ordered Johnson to show his hands, Johnson stood up slowly, turned around, and climbed onto the flat roof of the garage. He lay down and ignored repeated commands to climb down. Johnson later stood up and wandered back and forth on the roof.

Johnson eventually jumped down and started running east through the side yard of a house on Cascadia. As he approached a fence at the end of the side yard, Johnson "just launched himself, trying to jump over the fence." Johnson was unsuccessful and fell back, with Kelly just behind him.

When Kelly reached for Johnson's shoulder, Johnson hit him in the face. Kelly responded by striking Johnson in the head with his fist, and the two men wrestled for a

-4-

time. At some point during the struggle, Kelly felt his "gun and gun hand become trapped." Concerned that Johnson was attempting to take the gun, Kelly jerked the gun away and shot Johnson twice in the abdomen, causing serious injuries. Seattle police detectives found a pair of purple gloves on the ground nearby after Johnson was arrested.

Johnson testified that he spent the early evening of July 18 playing basketball with his friends Maxwell and Williams. The three men then walked to nearby Othello Park and smoked marijuana for a few hours.

At some point, Williams suggested they "hit a house," meaning commit a burglary. Johnson and Maxwell responded, "Whatever, let's do it." Maxwell, Williams, and Johnson took a bus to south Seattle, where Williams had seen a house with a computer in the window.

After getting off the bus, the men walked toward the house. All three put on purple gloves that Williams provided. Johnson claimed he suddenly changed his mind when he approached the house at around 1:30 a.m.:

> [A]t the time we was talking about it, it sounded good, but, um, when we got there, I realized that we didn't have no car to carry a lot of things out, and I wasn't going to carry anything out. So I basically told him, like, "I am not going inside the house."

Johnson was also concerned someone might be home.

Johnson waited in the backyard while Maxwell and Williams entered the house. He denied having a flashlight, going into the house, or carrying any of the stolen property.

When the two men came out, Maxwell was carrying a computer screen and keyboard and had a bag over his shoulder. Williams had a backpack. The three attempted to leave through the side yard on the north side of the house. As they approached the gate, they heard a police officer announce himself. The men turned around and ran in the other direction, toward the backyard.

Johnson ran to the back of the house and up some stairs into the backyard. He then hopped over a fence and climbed onto a roof. Johnson initially lay down on the roof, attempting to hide. Johnson had no idea where Maxwell and Williams went.

Johnson eventually jumped down from the roof and ran through the yard of a house on Cascadia. As Johnson tried to climb over a gate, Officer Kelly grabbed him by the ankles and pulled him back. Because Kelly was pointing a gun, Johnson tried to surrender by raising his hands and dropping to his knees. Johnson claimed that Kelly struck him in the head with a pistol and then shot him in the abdomen. Johnson denied ever touching Kelly or wrestling with him.

Medics transported Johnson to the hospital for treatment of the gunshot wounds. On July 20, 2014, while recovering from surgery, Johnson agreed to speak with police

detectives. During the interview, Johnson admitted that he had entered the house along with Williams and Maxwell and that he was "the look-out for this burglary." The trial court admitted the statements for impeachment purposes during Johnson's cross-examination.

Francis and Cuthebert identified various items strewn around the backyard that were taken from the house, including a guitar, a large computer monitor, costume jewelry, and a bag with a Bose speaker system. Several of the items lay on the ground between the stairway and the southeast corner of the backyard.

The State charged Johnson with one count of residential burglary, one count of resisting arrest, and one count of assault in the third degree. The court instructed the jury on both principal and accomplice liability for the burglary charge. The jury found Johnson guilty as charged of residential burglary and resisting arrest and not guilty of assault in the third degree.

The court imposed a 15-month sentence on the burglary conviction, the midpoint of the 13- to 17-month standard range.

ANALYSIS

Sufficiency of the Evidence

Johnson contends that the State failed to present sufficient evidence to support his conviction for residential burglary, either as a principal or as an accomplice. He

argues that because no one saw him inside the house or carrying any of the stolen property, the evidence was insufficient to prove beyond a reasonable doubt that he entered the residence or that he aided or facilitated commission of the crime. We disagree.

When reviewing a challenge to the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.[1] A claim of insufficiency admits the truth of the evidence and all reasonable inferences that a trier of fact can draw from that evidence.[2] Circumstantial evidence and direct evidence are equally reliable.[3]

To convict Johnson of residential burglary, the State needed to prove that Johnson or an accomplice "enter[ed] or remain[ed] unlawfully" in the Francis/Cuthebert home with the intent to commit a crime.[4] A person is an accomplice in the commission of a crime if,

> [w]ith knowledge that it will promote or facilitate the commission of the crime, he or she:
> (i) Solicits, commands, encourages, or requests such other person to commit it; or

---

[1] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).
[2] Salinas, 119 Wn.2d at 201.
[3] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).
[4] RCW 9A.52.025(1).

(ii) Aids or agrees to aid such other person in planning or committing it.[5]

Mere presence and knowledge of the criminal activity is insufficient to establish accomplice liability.[6] A person is not guilty as an accomplice unless he "associates himself with the venture and takes some action to help make it successful."[7]

Johnson acknowledged that he agreed to participate in the burglary, accompanied Maxwell and Williams to the house, and put on gloves to wear inside. The evidence indicated that the three men were at the house only a short time before the police arrived. Although he was not completely sure, Officer Belgarde believed he saw at least three persons inside.

The stolen items were found scattered widely around three sides of the house. The police arrested Williams as he came out of a window on the south side of the house, away from the backyard. Williams was not carrying any property. The officers arrested Maxwell as he attempted to hide in the northeast corner of the backyard.

The evidence, including Johnson's testimony, indicated that when he heard the police arrive, Johnson fled into the backyard, went up the steps, and then ran toward the southeast corner, on the opposite side of the property from Maxwell. A necklace, a black bag, and Bose speakers taken from the house lay along the route that Johnson

---

[5] RCW 9A.08.020(3)(a)(i), (ii).
[6] State v. Truong, 168 Wn. App. 529, 540, 277 P.3d 74 (2012).
[7] Truong, 168 Wn. App. at 539.

took, supporting a reasonable inference that he was carrying the items and dropped them as he fled.

Johnson relies heavily on his own testimony denying that he entered the house or that he carried any of the stolen items. But the State impeached Johnson's testimony with his postarrest statements admitting that he entered the house and acted as the "look-out" during the burglary. The jury's rejection of Johnson's account therefore involved a credibility determination that we cannot review. We necessarily defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence.[8]

Viewed in the light most favorable to the State, the evidence permitted the jury to find beyond a reasonable doubt that Johnson either entered the house with the intent to commit a crime or that he directly facilitated the crime by carrying stolen property away from the house. Substantial evidence supports Johnson's conviction for residential burglary.

---

[8] State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Appellate Costs

Johnson asks this court to deny an award of appellate costs should the State prevail on review.[9] He relies primarily on the trial court's determination that he was indigent for purposes of appeal and the court's waiver of any discretionary legal financial obligations. He also contends that his history of multiple juvenile felonies will hinder any future employment. He maintains that there is no reasonable likelihood he will ever be able to pay appellate costs.

An appellate court has discretion to consider appellate costs if a party raises the issue in its brief.[10] In State v. Sinclair,[11] we exercised our discretion to deny appellate costs to the State. Based on the defendant's continued indigency, his age (66 years old), and the length of his sentence (280 months), we concluded there was "no realistic possibility" that the defendant would be able to pay appellate costs.[12]

The circumstances here are distinguishable. Johnson was 20 years old at the time of sentencing. At sentencing, Johnson informed the court that at the time of the burglary, he had been working at two fast-food restaurants "basically every day of the

---

[9] See RAP 14.2 (appellate court commissioner or clerk "will" award costs to the substantially prevailing party on review "unless the appellate court directs otherwise in its decision terminating review").

[10] State v. Sinclair, 192 Wn. App. 380, 389-90, 367 P.3d 612, review denied, 185 Wn.2d 1034 (2016).

[11] 192 Wn. App. 380, 367 P.3d 612, review denied, 185 Wn.2d 1034 (2016).

[12] Sinclair, 192 Wn. App. at 393.

week" and had also been studying "criminal justice" at Everett Community College. The court imposed a relatively short 15-month sentence. Even though the court found Johnson indigent for purposes of appeal, the limited record before us, including his age, length of sentence, prior employment, and education efforts, suggests he may have a future ability to pay appellate costs.

Accordingly, we exercise our discretion and decline to preclude the State from seeking an award of appellate costs. Johnson may always seek remission of costs should payment "impose manifest hardship on the defendant [or] the defendant's immediate family."[13]

Affirmed.

_Leach, J._

WE CONCUR:

_Trickey, J_

_Verellen_

---

[13] Former RCW 10.73.160(4) (1995).

-12-