IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHNGTON, | ) | No. 78359-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DWAYNE DARNELL FISHER, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 29, 2019 |

SCHINDLER, J. — A jury convicted Dwayne Darnell Fisher of residential burglary and second degree theft. On appeal, Fisher argues sufficient evidence does not support the convictions. Because sufficient evidence supports the jury convictions, we affirm but remand to strike the DNA[1] fee.

FACTS

In September 2016, roommates Ariechell Palad, Fernando "Jordan" Lavides, and Curtis Albin moved into a two-story house in SeaTac on a cul-de-sac. There are "two different entrances" to the main house. The front entrance is a "heavy wood door" with "a bolt on top," a doorknob, and a screen door with "a locking mechanism." The back entrance to the kitchen has a "sliding glass door" with a lock.

---

[1] Deoxyribonucleic acid.

There is an attached single-car garage with an interior door to the house. The garage has two exterior doors. A manual "swing" garage door that opens in the front and another door "that leads to the backyard." The garage door to the backyard has a "straight bolt latch." The backyard is fenced. Palad, Lavides, and Albin kept a car, a motorcycle, car tools, and gardening tools in the garage.

On April 28, 2017, Palad came home from work around 2:00 p.m. Palad noticed that the fence gate "was wide open." Palad "thought that my roommates had c[o]me home early to do some yard work." Palad "didn't see anyone" in the yard and went inside the house. The sliding glass door at the back entrance was "[w]ide open" and "all of the drawers and cabinets in the kitchen were wide open." Palad went upstairs and saw "all of the bedroom doors were wide open."

Palad checked the downstairs. "[A]ll of the doors and the one leading to the garage were wide open." The interior door from the house to the garage was "kicked open" and the door "was on the floor." The exterior garage door to the backyard was "forcibly shoved in" and the bolt latch was "broken off . . . completely."

Palad called the police and then called Lavides and Albin. Lavides and Albin left work early and came home. Palad asked some neighbors whether "they noticed anything suspicious" but "[t]hey didn't hear anything."

King County Sheriff Deputy Jacob Fritz asked Palad, Lavides, and Albin to "start writing down a list of items that they immediately knew were missing from their house." Deputy Fritz took photographs of the house. Deputy Fritz obtained fingerprints from various surfaces, including the handle of the door "leading from the garage into the house."

The King County Regional Automated Fingerprint Identification System processed the fingerprint obtained from the interior garage door handle. The fingerprint matched Dwayne Darnell Fisher.

The State charged Fisher with residential burglary and theft in the first degree. Fisher pleaded not guilty.

Palad, Lavides, Albin, Deputy Fritz, and latent print examiner Cynthia Zeller testified at trial. The court admitted into evidence photographs of the house and copies of the latent fingerprint card and Fisher's fingerprint card.

Palad testified that she was the last roommate to leave the house on April 28. Palad said, "Everything was closed" and she locked the front door when she left for work.

Palad testified that when she walked through the house, she noticed the 52-inch flat-screen television was still there but "everything else wasn't." Palad testified that her laptop, camera, GoPro, iPod, and passport were stolen.

Palad testified that they did a lot of "garden work" because "our yard was really large and there was about, like, four — three to four trees. So it being springtime we were clearing out a lot of yard, like, debris from wintertime." Palad testified that they keep gardening tools in the garage. Palad said the door they primarily used to enter and exit the garage was the interior door "between the house and garage."

Palad testified that she did not know Dwayne Fisher. Palad testified that it was not "common . . . to have a lot of people in the house" that she did not know. Palad said, "The only ones I was semi unfamiliar with were Jordan's coworkers. But even

3

then I had met them, like, at least two to three times." Palad testified that it was not "possible that the Defendant in this case was one of those people."

Lavides testified that when he walked into the house, "[i]t was ransacked." Lavides said it "looked like the back door was kicked in by the garage, rooms were a mess, everything was thrown all over the place."

Lavides testified that his two "subwoofers were missing" from the garage and a "sub box that was out on the balcony" was stolen. Lavides testified that his Sony PlayStation 4 was "missing" with the "three maybe four" games that he downloaded "digitally through PlayStation stores." Lavides said the guitar "given to me by my dad" was stolen. Lavides testified that he "had tools that were missing," including "ratchets," "some expensive wrenches," "a torque wrench," and "a couple other smaller tools."

Lavides testified that he went into the garage "on occasion" and "moved stuff around or to work on my car." Lavides testified, "I would go in there probably at least once a week." Lavides said he entered and exited the garage "through the interior" door from the house.

Lavides testified that they did not have "large groups of people over to the house . . . [,] just a couple co-workers from work." Lavides testified that he did not "know anybody by the name of Dwayne Fisher" and did not recognize the defendant. Lavides said Fisher did not "have permission to be in . . . [his] home" at any time.

Albin testified that in his room, "there was clothes all over the floor that weren't there when I left. There's marks on my door and mainly just it was a lot messier than when I left." Albin testified that his "collector's edition" PlayStation 4 was stolen with "[a]ll the accessories for it, so, like, headsets, the controllers and the PlayStation

4

camera thing." Albin testified that "[a]ll of the games for it were gone" and he "had about 15 games and each one cost anywhere from, like, $40 to $60." Albin testified that "lots of cash" was stolen from his room, totaling "a little over a thousand." Albin said his "new power drill," a "brand-new bed sheet set," and his coin jar with approximately $100 worth of coins was stolen.

Albin testified that he did "gardening" at the house "[o]nce or twice a month." Albin said he would "[u]sually" use the interior door from the house to the garage to get the gardening tools. Albin testified that when he was done doing yard work, he would "go through the interior, close the garage, and make sure all the tools were back inside."

Albin testified, "Every once in a while Jordan would have a party with maybe six or seven people, but nothing ever larger than that." Albin said that Fisher was not "one of those people" that Lavides invited to the house. Albin testified that he did not "know anybody by the name of Dwayne Fisher." Albin said Fisher did not "look familiar" and did not "have permission to be in [his] home."

Deputy Fritz testified that there were "pry marks" on the front door that "indicated maybe someone tried to pry the door open." Deputy Fritz testified that there were pry marks on the "sliding glass door" on the "back side of the residence."

Latent print examiner Zeller testified that she has analyzed "hundreds of thousands" of fingerprints and never "found one fingerprint from one person to be identical to the fingerprint of another person." Zeller testified that there are "three different levels of detail" in a fingerprint comparison—"the ridge flow and pattern type is Level 1. The ending ridges and dividing ridges is Level 2. And . . . Level 3 . . . are called incipients," which are "ridges that didn't fully form." Zeller testified, "[Y]ou couldn't

get an identification . . . just based on Level 1" but an identification can be made "on Level 1 and 2" because "it's the Level 2 that is detail that you can use that will identify a specific person or source."

Zeller examined the latent print that Detective Fritz obtained from the interior garage door. Zeller said the "quality of the print was good." Zeller testified that she analyzed the "latent impression" and saw "Level 1 detail," "lots of Level 2 details," and "some Level 3 detail." Zeller compared the latent fingerprint to the known print of Dwayne Fisher and found 20 matching data points. Zeller concluded that the latent impression from the interior garage door and the known impression from Fisher were a match.

Zeller testified that on "non-porous" materials like "plastics, metals, [and] glass," fingerprints will "be more fragile because they're on the surface of the item." Zeller testified that on a metal doorknob, "the print would be on the surface of it" and it would be "easy to wipe that away." Zeller said that "if somebody else touched in the same spot as that fingerprint," then "[m]ost likely it would be wiped away."

At the close of the State's case-in-chief, defense counsel moved to dismiss the charges based on insufficient evidence. Defense counsel argued, "The State's evidence comes down to one partial print found . . . on the scene of the crime" and the "trier of fact could not reasonably infer that the fingerprint could have only been impressed at the time the crime was committed." Defense counsel argued the evidence showed "we don't know how long fingerprints last" and it is "very possible that the fingerprint could have gotten there . . . prior to the residents living there."

The prosecutor argued the jury could find that "it's not reasonable that a fingerprint could have lasted" on the door handle after the roommates moved into the house. The prosecutor argued the evidence showed that the roommates "did use very commonly . . . the door that the fingerprint was found on," "[t]hey would use that door to get into the garage, and they would use that door to reenter the house." The prosecutor argued, "None of them know of him. None of them know anybody by his name. None of them know anybody that looks like him. And nobody else had access to their home."

The court denied the motion to dismiss. The court concluded that "significant testimony" showed "there were limited number of people who had access to this house within the prior eight months, that no one named Mr. Fisher who was Mr. Fisher was given permission to have access." The court found there was "testimony from the fingerprint examiner that on a hard surface like a doorknob the fingerprints, while they could last indefinitely, would be likely to be wiped off." The court ruled that "a reasonable jury, in light of the testimony, could conclude that Mr. Fisher is guilty beyond a reasonable doubt."

The court instructed the jury on residential burglary, theft in the first degree, and the lesser included crime of theft in the second degree. At the request of defense, the court instructed the jury on the lesser included charge of criminal trespass in the first degree.

In closing argument, defense counsel argued, "[T]he evidence is a single fingerprint . . . . It's a little portion of a single print" and "there's no other evidence to connect him to this crime." Defense counsel argued a "little bit of a fingerprint" is not

"good enough for you to be convinced beyond a reasonable doubt." Defense counsel argued that although the burglary "had to have happened in this window between 9:00 a.m. and 2:00 p.m.[,] . . . the fingerprint did not have to happen in that window."

The jury found Fisher guilty of residential burglary. The jury convicted Fisher of the lesser included offense of theft in the second degree. Fisher appeals.

ANALYSIS

Sufficiency of the Evidence

Fisher contends sufficient evidence does not support the convictions for residential burglary and second degree theft because the State failed to establish that his fingerprint was impressed at the time of the crime.

" 'When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.' " State v. Johnson, 188 Wn.2d 742, 762, 399 P.3d 507 (2017) (quoting State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). Evidence is sufficient if after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Owens, 180 Wn.2d 90, 99, 323 P.3d 1030 (2014). We consider both circumstantial and direct evidence as equally reliable and defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), aff'd, 166 Wn.2d 380, 208 P.3d 1107 (2009).

Fingerprint evidence alone is sufficient to support a conviction if "the trier of fact could reasonably infer from the circumstances that it could only have been impressed at

the time the crime was committed." State v. Lucca, 56 Wn. App. 597, 599, 784 P.2d 572 (1990). To support a finding of guilt beyond a reasonable doubt in a "fingerprint-only" case, the State must establish that the object upon which the fingerprint was found was generally inaccessible to the defendant at a previous time. State v. Bridge, 91 Wn. App. 98, 100, 955 P.2d 418 (1998). " 'While the government need not exclude all inferences or reasonable hypotheses consistent with innocence, . . . the record must contain sufficient probative facts from which a factfinder could reasonably infer a defendant's guilt, under the beyond a reasonable doubt standard.' " Bridge, 91 Wn. App. at 100[2] (quoting Mikes v. Borg, 947 F.2d 353, 357 (9th Cir. 1991)).

Here, the evidence established that the fingerprint was taken from the handle of an interior door leading from the garage to the main house. Palad testified that "[e]verything was closed" when she left the house on April 28. Palad, Lavides, and Albin each testified that a large "swing" door and an exterior door to the backyard with a "bolt latch" enclosed the garage. Albin testified that after using the garage, they made sure to "close the garage."

The latent print examiner testified that a fingerprint on a metal doorknob is "easy to wipe . . . away" and "[m]ost likely" would be wiped away if "somebody else touched in the same spot as that fingerprint." The overwhelming testimony established that Palad, Lavides, and Albin used only the interior door to enter the garage. When they were done using the garage, Palad, Lavides, and Albin would use the interior door to go back into the house. The testimony showed that they used the interior door to the garage on a regular basis and at least once a week.

---

[2] Alteration in original.

Lucca is analogous. In Lucca, the defendant's fingerprint was lifted from a piece of broken glass from a window in the back of the residence. Lucca, 56 Wn. App. at 598. Fences enclosed the window. Lucca, 56 Wn. App. at 598. No direct evidence showed the print was made at the time of the burglary and no evidence placed the defendant in the vicinity at the time of the burglary. Lucca, 56 Wn. App. at 599. But the resident did not know the defendant and the defendant did not have permission to enter. Lucca, 56 Wn. App. at 601. The defendant offered no alternate explanation for how his prints came to be on the glass and the window was in a location that was generally inaccessible to the public. Lucca, 56 Wn. App. at 601. We concluded that the evidence was sufficient to support the conviction. Lucca, 56 Wn. App. at 603. Here, as in Lucca, there is no evidence of any reasonable explanation as to how Fisher's fingerprint got on the door handle. Palad, Lavides, and Albin all testified that they did not know Fisher, he had never been to their house, and he did not have permission to be in the house.

Relying on Bridge, Fisher contends the evidence did not "support the inference that Fisher could only have accessed the home and left an imprint on the day of the burglary." In Bridge, the defendant's fingerprint was found on a price tag affixed to a newly purchased tool. Bridge, 91 Wn. App. at 101. The evidence showed the tool was "purchased in an area open to the public." Bridge, 91 Wn. App. at 101. The court concluded that because the tool was "accessible to Mr. Bridge before being moved by the victim to his barn," the evidence was insufficient to reasonably infer that his fingerprint could have only been impressed at the time of the crime. Bridge, 91 Wn. App. at 101. In reaching this conclusion, the court specifically distinguished "between moveable objects generally accessible to the public and fixed objects generally

inaccessible to the public." <u>Bridge</u>, 91 Wn. App. at 101. Unlike in <u>Bridge</u>, the door handle is a fixed object not accessible to the public.

Viewing the evidence in the light most favorable to the State, we conclude the jury could reasonably infer from the circumstances that Fisher's fingerprint could have only been impressed at the time the crime was committed.[3]

<u>DNA Fee</u>

Fisher contends and the State concedes that the panel should remand to strike imposition of the $100 DNA fee because the State previously collected Fisher's DNA due to a prior conviction. We accept the State's concession as well taken. <u>See</u> RCW 43.43.7541; <u>State v. Ramirez</u>, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

We affirm the convictions but remand to strike the DNA fee in the judgment and sentence.

WE CONCUR:

---

[3] Because sufficient evidence supports the residential burglary conviction, we need not address Fisher's argument that the court erred by denying the motion to dismiss the charge of residential burglary for insufficient evidence.