IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39084-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RILEY JAMES HILLESTAD, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Among other charges, Riley Hillestad was convicted of second degree felony murder, tampering with physical evidence, and failure to notify the coroner. The convictions stem from Mr. Hillestad's involvement in the disappearance and murder of Jason Fox. Mr. Hillestad appeals, arguing that his convictions for second degree felony murder and tampering with physical evidence are not supported by sufficient evidence, and the victim penalty assessment (VPA) and DNA collection fee were improperly ordered against him.

The State concedes that Mr. Hillestad's conviction for tampering with physical evidence is not supported by sufficient evidence and that we should remand for the trial court to strike the VPA and DNA collection fee. Further, the State requests Mr. Hillestad's conviction for failing to notify the coroner be vacated because it violates his Fifth Amendment right against self-incrimination under the United States Constitution.

We affirm Mr. Hillestad's conviction for second degree felony murder, remand for the trial court to vacate Mr. Hillestad's convictions for tampering with physical evidence and failing to notify the coroner, and direct the trial court to strike the VPA and DNA collection fee from the judgment and sentence.

## BACKGROUND

On September 15, 2020, Jason Fox was reported missing. The evening prior, Mr. Fox sent his friend and former roommate two text messages that stated "22 Yergens Road" and "Just in case—but in case anything happens to me." Rep. of Proc. (RP) at 405. [1] Law enforcement began investigating Mr. Fox's disappearance and quickly turned their attention to 22 Yergens Road.

22 Yergens Road, located in Newport, Washington (the Property) spans over 50 acres. The Property contains a farmhouse, barns, a shop with a living space upstairs, an

---

[1] Unless otherwise noted, "RP" refers to the verbatim report of proceedings beginning on October 14, 2021.

apartment, and a tiny home. The Property also has a wedding venue and wooded areas abutting Newport Lake State Park.

Multiple people lived at or were associated with the Property, including: Mr. Hillestad, Amanda Pierson, Ashley Shelgren, Georgia Sharp, Matthew Raddatz-Freeman, Claude Merritt, and Kevin Belding. Mr. Fox was previously friends with the group but a falling out had occurred sometime before he disappeared.

Two days after Mr. Fox was reported missing, law enforcement officers went to the Property and spoke with Mr. Hillestad who told them he had not seen Mr. Fox "for about a month." RP at 349. A few days later, officers spoke to Mr. Hillestad again, and he admitted seeing Mr. Fox at the Property on the night he disappeared. Mr. Hillestad stated he witnessed Mr. Raddatz-Freeman argue with Mr. Fox before Mr. Fox left the Property. Mr. Hillestad also said "he did not like [Mr. Fox], did not want [Mr. Fox] around, and that [Mr. Fox] was causing constant problems with his group of friends." RP at 304.

On September 22, Mr. Fox's vehicle was found "hidden in the woods" outside of Libby, Montana. RP at 304. Investigators found Mr. Fox's wallet and the car's keys inside the vehicle.

The Newport Police Department arranged a search of the Property using Spokane County Search and Rescue Team's human remains detection dogs. The search commenced on October 3, 2020, with the Property owner's consent. The human remains

detection dogs are trained to detect "all" types of human tissue, including blood. RP at 531. The canines are taught to "get to the closest point of the odor" and sit. RP at 529.

While searching the shop on the Property with the dogs, Newport Police Chief Mark Duxbury noticed "reddish brown" smudge marks in the building's upstairs bathroom that appeared to be consistent with blood. RP at 316. Inca, one of the human remains detection dogs, alerted several times in the shop by displaying a trained final sit response at the downstairs desk and the bathroom upstairs.

Outside, in a wooded area, officers discovered a prescription pill bottle with Mr. Fox's name on it. Officers searched the path between the shop and the location where the pill bottle was discovered. During the search, they found a pair of glasses about 30 feet from the pill bottle, as well as a blue latex glove, a ratchet strap, and a bottle of bleach.

Continuing down the path, officers discovered an "unusual" clearing. RP at 334. In the clearing, there was a boat placed directly on the ground, a sailboat, and an apparently functional boat trailer flipped upside down. Additionally, officers noticed that the soil was "spongy" and found it odd that the boat was placed directly on the ground even though there was a trailer nearby. RP at 336, 338.

Officers requested that the human remains detection dogs search the clearing. Inca began "working" back and forth along the boat and did a trained final sit response at

4

the back of the boat. RP at 543. Investigators then towed the boat and began excavating the soil underneath it.

Mr. Fox's body was quickly discovered buried a few feet underground. Mr. Fox had a large head wound, and his hands were tied behind his back. A broken cell phone was found in Mr. Fox's front pant pocket. The phone appeared to have been deliberately crushed.

An autopsy was performed by Doctor John Howard. It was Dr. Howard's opinion that Mr. Fox's body was buried over a week prior to its discovery. Dr. Howard found evidence of an injury to Mr. Fox's head consistent with a blunt object striking the side of Mr. Fox's skull. Dr. Howard determined Mr. Fox's cause of death was a blunt force head injury consistent with an impact from "a heavy instrument" such as a "baseball bat, sledgehammer" or "softball-size rock." RP at 741-42.

Investigators also searched the shop on the Property where they found bloodstains in various areas including the kitchen and one of the rooms on the ground level. The second floor of the shop had two bedrooms, each with attached bathrooms. One of the bathrooms contained bloodstains in various places. Investigators also removed a Ranger brand side-by-side off road vehicle from the Property to be processed.

Mr. Hillestad was questioned for a third time on November 7, 2020. This time, Mr. Hillestad said he operated a skid steer[2] on the Property the night Mr. Fox disappeared. In regard to the boats, Mr. Hillestad said they were placed in the clearing because Ms. Pierson "didn't want [them] to be in wedding photos." RP at 672. Mr. Hillestad also admitted that there was an altercation between Mr. Fox and Mr. Merritt, Mr. Belding, and Mr. Raddatz-Freeman on the night Mr. Fox disappeared. He said that Mr. Merritt "tackled [Mr. Fox] and kicked him till he stopped moving." RP at 677.

Mr. Hillestad, Mr. Raddatz-Freeman, Mr. Merritt, and Mr. Belding were ultimately arrested and charged for their involvement in Mr. Fox's disappearance and murder. Mr. Hillestad was charged with first degree felony murder, second degree felony murder, first degree manslaughter, kidnapping, unauthorized removal or concealment of a body, tampering with physical evidence, unlawful disposal of remains, and failure to notify the coroner. The parties agreed to sever the trials of Mr. Hillestad and his co-defendants.

---

[2] This particular skid steer "was a CAT model, skid steer with tracks, maybe a four yard bucket and a full cage around the seat." RP at 913. It was "yellow" and had "two LED, almost like old KC lights mounted to the top, front corners." RP at 913.

Mr. Hillestad's case proceeded to trial in June 2022. A multitude of witnesses testified, including Mr. Hillestad's co-defendants, Mr. Raddatz-Freeman and Mr. Belding.

Mr. Raddatz-Freeman testified that he used methamphetamine and was at the Property on the night of Mr. Fox's murder. When he arrived at the Property, he saw Mr. Belding, Mr. Merritt, and Mr. Fox in the shop. Mr. Raddatz-Freeman told Mr. Fox he needed to leave because "[h]e wasn't in the good graces of anybody on the property." RP at 922. Mr. Fox and Mr. Raddatz-Freeman walked to an office in the shop where Mr. Merritt and Mr. Belding were. Mr. Hillestad arrived shortly thereafter and stood outside the office. An argument ensued between Mr. Fox and the others, and Mr. Fox attempted to leave multiple times.

Mr. Raddatz-Freeman attested that Mr. Merritt took Mr. Fox's cell phone from him and handed it to Mr. Hillestad who then "smashed it onto the concrete." RP at 929. Mr. Fox again tried to leave and was "hit in the face by Mr. Hillestad." RP at 930. When he tried to leave once more, Mr. Hillestad kicked Mr. Fox in the face. Mr. Merritt also kneed Mr. Fox in the face multiple times. Mr. Raddatz-Freeman testified that he left the office at this point. As he departed, he testified that he saw Mr. Merritt lead Mr. Fox, who was bound at the wrists with a ratchet strap, out of the shop.

Mr. Raddatz-Freeman testified that when he stepped outside to smoke a cigarette, he saw the Ranger side-by-side, about 100 yards away, with someone standing in the

back of it "stomping down on something in the bed" of the truck. RP at 937. Though it was dark, Mr. Raddatz-Freeman was able to see the Ranger because someone was operating the skid steer with its lights illuminated. Mr. Raddatz-Freeman then walked over to the location of the Ranger and saw Mr. Merritt jump "off the back of the Ranger," open the tailgate, and pull "Mr. Fox out of the back." RP at 938.

Mr. Raddatz-Freeman stated that he next saw Mr. Merritt help Mr. Fox up and walk him towards a "hole that had been dug." RP at 939. Mr. Merritt forced Mr. Fox to his knees in front of the hole, and Mr. Fox said "'Oh, god, they're actually going to do it.'" RP at 939-40. Mr. Merritt then left the area in the Ranger. Mr. Raddatz-Freeman witnessed Mr. Hillestad get out of the skid steer that was being operated in the same area. Mr. Raddatz-Freeman walked back to the shop, leaving Mr. Fox alone with Mr. Hillestad. Back at the shop, Mr. Raddatz-Freeman saw Mr. Belding and Mr. Merritt leave the Property.

Mr. Raddatz-Freeman testified that he "smoked some in the garage, got a glass of water, and then came out of the garage." RP at 942. While outside, Mr. Raddatz-Freeman saw the skid steer being operated "in the tree line, like, actually in the trees" so he got in the Ranger to drive to the area the skid steer was being operated to "see what was going on." RP at 942. When he got to the area, he observed Mr. Hillestad operating the skid steer. He looked down toward the bucket of the skid steer and saw "legs sticking out from the side of the bucket . . . kicking sporadically." RP at 943. He testified that he

8

recognized the legs as Mr. Fox's. Mr. Raddatz-Freeman believed that Mr. Fox was face down and stated the bucket was in such a position to render Mr. Fox unable to "get out from underneath it." RP at 943. Mr. Raddatz-Freeman again left the area.

About 15 minutes later, Mr. Raddatz-Freeman went to the tiny home on the Property where Mr. Hillestad stayed. There, he encountered Ms. Shelgren and Mr. Hillestad. Mr. Hillestad told Mr. Raddatz-Freeman he needed to get rid of Mr. Fox's vehicle. Mr. Raddatz-Freeman and Mr. Hillestad trailered Mr. Fox's vehicle to Montana where they abandoned it.

Thereafter, Mr. Merritt, Mr. Belding, Mr. Raddatz-Freeman, and Mr. Hillestad reconvened at the Property, and Mr. Hillestad instructed the group to say they had not seen Mr. Fox in months. Mr. Hillestad told the group that "if one of us went down, we would all go down." RP at 954. Mr. Hillestad told the group Mr. Fox "was dead and that, yes, he was buried in the back." RP at 954.

Mr. Belding testified he was friends with Mr. Fox and the other individuals associated with the Property, including Mr. Merritt, Mr. Hillestad, and Mr. Raddatz-Freeman. On the night Mr. Fox disappeared, Mr. Belding arrived at the Property after "doing drugs" and continued to use drugs while at the Property. RP at 444-45.

Mr. Belding stated he saw Mr. Fox and Mr. Hillestad arguing in the shop. He saw an "altercation" between Mr. Fox, Mr. Merritt, and Mr. Hillestad. RP at 450-51.

Mr. Belding said he saw someone push Mr. Fox. Mr. Belding left the shop and talked with Ms. Pierson at the house on the Property for approximately 20 minutes. When he returned, Mr. Fox was no longer there, but Mr. Raddatz-Freeman and Mr. Merritt were in the shop. Mr. Belding and Mr. Merritt then left the Property.

Autumn Gillock testified she had been friends with Mr. Hillestad for "a long time." RP at 489-90. On September 8, Ms. Gillock used drugs with Mr. Hillestad at the Property, and Mr. Hillestad twice asked her to "lure [Mr. Fox] out to Yergens Road so that they could beat him up." RP at 490-91. Ms. Gillock testified Mr. Hillestad wanted to get Mr. Fox to the Property because Mr. Fox "owed him money and that he had sent pictures of [Mr. Hillestad] doing drugs to his daughter's mom." RP at 492. Because of this, Mr. Hillestad could not have contact with his daughter.

Ashley Shelgren testified she also used methamphetamine "daily." RP at 561. Ms. Shelgren had known Mr. Hillestad for most of her life and was close friends with him. Ms. Shelgren testified she knew Mr. Fox and that she had "ripped him off" the day before he disappeared by selling him "salt rather than meth" for his Apple Watch. RP at 562-63, 568.

Ms. Shelgren went to the Property the day Mr. Fox disappeared to speak with Mr. Hillestad. After Ms. Shelgren arrived at the Property, she took a nap in Mr. Hillestad's tiny house. Mr. Hillestad awoke Ms. Shelgren and asked if she wanted to do drugs in the shop. Ms. Shelgren declined and returned to her slumber. Later, Mr. Hillestad returned

and informed Ms. Shelgren that Mr. Fox was coming to the Property. This "irritated" Ms. Shelgren because she had just "ripped [Mr. Fox] off the day before." RP at 568. She was also "confused" that Mr. Fox was at the Property because the group "had stopped hanging out with him" and they "didn't talk to him" anymore. RP at 568-69. Ms. Shelgren again went back to sleep.

Ms. Shelgren testified she was again awakened by Mr. Hillestad who was "agitated." RP at 570. Mr. Hillestad told her "the kid was gone," referring to Mr. Fox. RP at 570-71. Mr. Hillestad then asked Ms. Shelgren to "clean up the shop" by wiping it down to ensure there were "no [finger]prints." RP at 571-72. He also asked her to drag the driveway with a "cattle grate" to get rid of tire tracks. RP at 572. Ms. Shelgren sprayed the shop with "ammonia and bleach." RP at 574. She also recalled Mr. Hillestad giving her a bag of tools belonging to Mr. Fox which she later burned because "it was imperative that nothing of [Mr. Fox's] get left behind." RP at 580.

Amanda Pierson is the girlfriend of Mr. Raddatz-Freeman. Ms. Pierson lived at the Property with Mr. Raddatz-Freeman and their three children. The night Mr. Fox disappeared, Ms. Pierson bedded down around 7:00 p.m. but was awakened by the sound of a "vehicle flying by on the road." RP at 473. When she got up to investigate, she realized the vehicle was the Ranger. Ms. Pierson testified the Ranger was being driven toward the wooded area of the Property.

Ms. Pierson called Mr. Hillestad and Mr. Raddatz-Freeman to ask what was going on. Ms. Pierson told them not to drive by the house again because the noise had awoken one of her children. Ms. Pierson also heard and saw the skid steer being operated. Ms. Pierson testified she had only known Mr. Hillestad to operate the skid steer. Ms. Pierson did not sleep through the night because Mr. Raddatz-Freeman came into the house in the early hours of the morning, grabbed some socks, and left. Ms. Pierson also sent a text message to Georgia Sharp stating that Mr. Fox was at the Property, Mr. Belding "had just showed up and went down to the shop," and that "[b]oys were stupid." RP at 480.

Ms. Sharp was Mr. Belding's girlfriend. She testified that Mr. Raddatz-Freeman and Mr. Belding went to the Property on the night Mr. Fox disappeared. Ms. Sharp was text messaging Ms. Pierson that night to ask about Mr. Belding's whereabouts. A few days after Mr. Fox disappeared, Ms. Sharp overheard Mr. Hillestad say that Mr. Belding and Mr. Merritt "better not say anything stupid." RP at 514.

Mr. Hillestad testified that Mr. Merritt was the one who killed Mr. Fox. He testified that Mr. Merritt often operated the skid steer. Mr. Hillestad also testified that Ms. Shelgren was at the Property on the night that Mr. Fox disappeared and that she had slept in his tiny home. Mr. Hillestad claimed that he was doing work on the Property and Mr. Merritt summoned him to the shop where he encountered Mr. Fox, Mr. Raddatz-Freeman, and Mr. Belding. He testified that Mr. Merritt and Mr. Fox began arguing, and Mr. Hillestad ultimately smashed Mr. Fox's phone. Mr. Fox attempted to leave but Mr.

Hillestad testified Mr. Raddatz-Freeman would not let him. Mr. Hillestad also testified that Mr. Fox said things to him that "really made [him] mad" and that he "hit [Mr. Fox] as hard as he could." RP at 1119-20. Mr. Hillestad further testified that he kicked Mr. Fox, knocking him out. RP at 1120-21. Mr. Merritt began "kneeing" Mr. Fox in the face. RP at 1121. Mr. Hillestad testified he then left the shop, and that was the last time he saw Mr. Fox alive. Mr. Hillestad admitted to assisting in the disposal of Mr. Fox's car but denied killing or burying Mr. Fox.

Mr. Hillestad was convicted of second degree felony murder, unauthorized removal or concealment of a body, tampering with physical evidence, unlawful disposal of remains, and failure to notify the coroner.

Mr. Hillestad timely appeals.

ANALYSIS

WHETHER THERE WAS SUFFICIENT EVIDENCE TO CONVICT MR. HILLESTAD OF MURDER IN THE SECOND DEGREE

Mr. Hillestad argues his conviction for felony murder in the second degree is not supported by sufficient evidence. He contends the State presented insufficient evidence to prove there was a connection between Mr. Hillestad's assault of Mr. Fox and the assault that resulted in his death. He also argues there was insufficient evidence to prove accomplice liability. We disagree with his arguments.

The sufficiency of the evidence is a question of law this court is reviews de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). In a sufficiency of the evidence

13

challenge, "we review the evidence in the light most favorable to the State to determine 'whether . . . any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that can reasonably be drawn from it." *State v. DeVries*, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

RCW 9A.32.050(1)(b) states:

> (1) A person is guilty of murder in the second degree when: (b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

Here, to prove second degree felony murder, the State had to prove Mr. Hillestad committed or attempted to commit second or third degree assault, and that in the course of and in furtherance of that assault, he, or another, caused Mr. Fox's death. RCW 9A.32.050(1)(b); *see State v. Gamble*, 154 Wn.2d 457, 465, 114 P.3d 646 (2005).

14

The evidence at trial showed Mr. Hillestad had attempted to lure Mr. Fox to the Property multiple times, that he was angry at him because Mr. Fox owed him money, and that he blamed Mr. Fox for his child custody issues. On the night Mr. Fox disappeared, Mr. Raddatz-Freeman testified that Mr. Hillestad "hit" or "punch[ed]" Mr. Fox in the face while they argued in the shop. RP at 930 (Mr. Raddatz-Freeman); 1119-20 (Mr. Hillestad). Similarly, Mr. Hillestad also testified that he "hit" or "punch[ed]" Mr. Fox in the face while they argued in the shop and that he kicked Mr. Fox in the face, knocking him out. RP at 1119-21. Shortly thereafter, Mr. Merritt transported Mr. Fox to a different location on the Property and continued beating him in the bed of the Ranger.

Mr. Raddatz-Freeman testified that he observed the skid steer being operated "toward the back corner of the property" and that the skid steer's lights illuminated the Ranger. RP at 937. When Mr. Raddatz-Freeman went to investigate, he saw Mr. Merritt push Mr. Fox, who was still alive, to his knees in front of a hole Mr. Hillestad had dug with the skid steer. Mr. Raddatz-Freeman testified that he and Mr. Merritt went back to the shop, leaving Mr. Fox alone with Mr. Hillestad.

When Mr. Raddatz-Freeman observed the skid steer being operated once more, he again went to investigate. Mr. Raddatz-Freeman testified he saw Mr. Hillestad operating the skid steer and that he saw the bucket on top of Mr. Fox. Mr. Raddatz-Freeman also witnessed Mr. Fox's "legs sticking out from the side of the bucket . . . kicking sporadically." RP at 943. A few minutes later, Mr. Raddatz-Freeman saw Mr. Hillestad

15

at his tiny home, and Mr. Hillestad began making plans to dispose of Mr. Fox's vehicle.

Mr. Hillestad also admitted Mr. Fox was dead and buried on the Property.

Mr. Hillestad does not dispute that he committed second or third degree assault

when he punched and kicked Mr. Fox in the shop. Instead, he argues Mr. Fox's death did

not occur in the course of or in furtherance of the assault. Notwithstanding this

argument, Mr. Hillestad and Mr. Merritt had one objective that night—retribution against

Mr. Fox. Their conduct was aimed at that objective, and Mr. Hillestad's assault of Mr.

Fox in the shop was in furtherance of that goal, ultimately resulting in Mr. Fox's death in

the woods on the Property. Even if Mr. Hillestad did not inflict the final blow that ended

Mr. Fox's life (though the evidence suggests he did), he fully participated in the events

leading up to Mr. Fox's death. Consequently, there was sufficient evidence to convict

Mr. Hillestad of second degree felony murder.

Mr. Hillestad next argues there was insufficient evidence to prove he was

Mr. Merritt's accomplice. However, the State was not required to prove Mr. Hillestad

was the principal or the accomplice to secure a conviction for second degree felony

murder. Mr. Hillestad points to the jury's apparent confusion on what constituted

accomplice liability, evidenced by the questions they asked the court during

deliberations. Whether Mr. Hillestad was the principal or accomplice has nothing to do

with his crime of conviction. Indeed, to be convicted of felony murder, the State only

had to prove that Mr. Fox's death, whether caused by Mr. Hillestad or another, happened in the course of or in furtherance of Mr. Hillestad's assault.

The State presented sufficient evidence to convict Mr. Hillestad of second degree felony murder. Thus, Mr. Hillestad's claim that there was insufficient evidence to prove he was Mr. Merritt's accomplice fails.

### WHETHER MR. HILLESTAD'S CONVICTION FOR TAMPERING WITH PHYSICAL EVIDENCE SHOULD BE VACATED

Mr. Hillestad argues that his conviction for tampering with physical evidence should be vacated due to insufficient evidence. The State concedes, as it did in the appeal of Mr. Hillestad's co-defendant, Mr. Merritt.[3] We accept the State's concession and remand for the court to vacate Mr. Hillestad's conviction for tampering with physical evidence.

RCW 9A.72.150(1)(a) reads:

> (1) A person is guilty of tampering with physical evidence if, having reason to believe that an official proceeding is pending or about to be instituted and acting without legal right or authority, he or she: (a) Destroys, mutilates, conceals, removes, or alters physical evidence with intent to impair its appearance, character, or availability in such pending or prospective official proceeding.

---

[3] *State v. Merritt*, No. 38763-1-III, slip op., at *7 (Wash. Ct. App. Nov. 28, 2023), https://www.courts.wa.gov/opinions/ pdf/387631_unp.pdf (unpublished).

17

An official proceeding is "a proceeding heard before any legislative, judicial, administrative, or other government agency or official authorized to hear evidence under oath, including any referee, hearing examiner, commissioner, notary, or other person taking testimony or depositions." RCW 9A.72.101(4).

As discussed in *State v. Merritt*, to sustain a conviction for tampering with physical evidence, the State had to prove that Mr. Hillestad: (1) destroyed, mutilated, concealed, removed, or altered physical evidence, and (2) had reason to believe an official proceeding was about to begin and "with intent to impair" the evidence for such proceeding. RCW 9A.72.150(1)(a).

Here, the parties agree that the State did not present evidence that Mr. Hillestad had reason to believe an official proceeding was pending or about to be instituted when he helped dump Mr. Fox's car in Montana and when he "took other actions to impair the collection of evidence related to the disappearance or death of Mr. Fox." RP at 169.

During its closing argument, the State asserted that Mr. Hillestad loaded up and took Mr. Fox's vehicle to Montana in an attempt to conceal it. The State also posited that Mr. Hillestad directed Ms. Shelgren to "clean up the shop, to remove prints and to drag the driveway to remove tire prints" in order to conceal evidence of Mr. Fox's disappearance. RP at 1189. The State failed to present evidence that Mr. Hillestad took these actions "having reason to believe that an official proceeding [was] pending or about

18

to be instituted." RCW 9A.72.150(1)(a). Consequently, we remand for the trial court to

vacate Mr. Hillestad's conviction for tampering with physical evidence.[4]

WHETHER MR. HILLESTAD'S CONVICTION FOR FAILURE TO NOTIFY THE CORONER SHOULD BE VACATED

Though not raised by Mr. Hillestad, the State asserts that Mr. Hillestad's

conviction for violating the coroner notification statute should be vacated. In *State v.*

*Merritt*, we vacated Mr. Merritt's conviction for violating the coroner notification statute

on the basis that it was unconstitutional as applied to him. No. 38763-1-III, slip op. at 33.

Because Mr. Hillestad's conviction for violating the statute was based on the same

evidence, we follow our holding in *Merritt* and remand for the trial court to vacate Mr.

Hillestad's conviction for failure to notify the coroner of a body. *Id*.

RCW 68.50.020 states:

It shall be the duty of every person who knows of the existence and location of human remains coming under the jurisdiction of the coroner or medical examiner as set forth in RCW 68.50.010 or 27.44.055, to notify the coroner, medical examiner, or law enforcement thereof in the most expeditious manner possible, unless such person shall have good reason to believe that such notice has already been given. Any person knowing of the existence of such human remains and not having good reason to believe that the coroner has notice thereof and who shall fail to give notice to the coroner as aforesaid, shall be guilty of a misdemeanor.

---

[4] Mr. Hillestad also argues that the information charging him with tampering with physical evidence was defective. Because there was insufficient evidence to support the conviction, we decline to address this argument.

The Fifth Amendment states "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The Washington State Constitution similarly provides that "[n]o person shall be compelled in any criminal case to give evidence against himself." WASH. CONST. art. I, § 9. Fifth Amendment challenges generally have two prongs: (1) whether the defendant's statements exposed them to a realistic threat of self-incrimination in a subsequent proceeding, and (2) whether the State sought to impose substantial penalties because a witness exercised their Fifth Amendment right. *State v. Flannery*, 24 Wn. App. 2d 466, 480, 520 P.3d 517 (2022).

In *Merritt*, we found that Mr. Merritt's conviction for failure to notify the coroner of a body, as applied to the facts of his case, violated his right against self-incrimination. No. 38763-1-III, slip op. at *9. There, we agreed with Mr. Merritt that if he had notified the coroner, a medical examiner, or law enforcement of the location of Mr. Fox's body, that disclosure could have been used against him in a criminal proceeding. *Id.* Further, we reasoned that Mr. Merritt's conviction amounted to a substantial penalty for exercising his right against self-incrimination. *Id.* Accordingly, we held that the conviction was unconstitutional as applied to Mr. Merritt. *Id.*

Here, Mr. Hillestad's conviction for failing to notify the coroner of the location of a body was based on the same evidence as Mr. Merritt's. Mr. Hillestad was accused of "unlawfully conceal[ing] the body of" Mr. Fox. RP at 169. The State argued to the jury that Mr. Hillestad's comment to Ms. Shelgren that "[t]he kid is gone" could be inferred to

20

mean that Mr. Fox was dead, and Mr. Hillestad knew his body was on the Property. RP at 1191. Further, the State argued Mr. Raddatz-Freeman's testimony that Mr. Hillestad told him, Mr. Belding, and Mr. Merritt that he killed Mr. Fox and buried him on the Property was evidence that Mr. Hillestad knew the location of Mr. Fox's body and failed to notify the coroner. Finally, the State pointed to testimony from Mr. Raddatz-Freeman in which he said he saw Mr. Hillestad operating the skid steer at the location Mr. Fox's body was found.

As in Mr. Merritt's case, had Mr. Hillestad notified the coroner or law enforcement of the location of Mr. Fox's body, he would have incriminated himself. Mr. Hillestad knew the location of the body because he was the one who buried or helped bury Mr. Fox. Further, his conviction for failing to notify the coroner of a body was a substantial penalty for exercising his right against self-incrimination. We remand for the trial court to vacate Mr. Hillestad's conviction for failing to notify the coroner of a body.

WHETHER THE VPA AND DNA COLLECTION FEE SHOULD BE STRUCK FROM MR. HILLESTAD'S JUDGMENT AND SENTENCE

Mr. Hillestad requests that we remand his case to have the trial court strike the VPA and DNA collection fee. The State concedes.

Former RCW 7.68.035(1)(a) (2018) required a VPA be imposed on any individual found guilty of a crime in superior court. In April 2023, the legislature amended RCW 7.68.035 to prohibit the imposition of the VPA on indigent defendants. *See* LAWS OF

21

2023, ch. 449, § 1. H.B. 1169 took effect on July 1, 2023. Amendments to statutes that impose costs upon convictions apply prospectively to cases pending on appeal. *See State v. Ramirez*, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018).

Similarly, pursuant to former RCW 43.43.754 (2018), the trial court was required to impose a $100 DNA collection fee for every sentence imposed for the crimes specified in the statute. Effective July 1, 2023, the legislature amended RCW 43.43.754 by eliminating language that made imposition of the DNA collection fee mandatory. *See* LAWS OF 2023, ch. 449, § 4.

Because Mr. Hillestad's case is pending on direct appeal, the amendments apply. Further, though the court did not check the box indicating Mr. Hillestad was indigent, the court implicitly found him to be indigent when it only imposed mandatory, non-waivable legal financial obligations (LFOs). Additionally, Mr. Hillestad was found to be indigent for purposes of this appeal. We remand for the trial court to strike the VPA and DNA collection fee from Mr. Hillestad's judgment and sentence.

## CONCLUSION

We affirm Mr. Hillestad's conviction for second degree felony murder, remand for the trial court to vacate Mr. Hillestad's misdemeanor convictions for tampering with physical evidence and failing to notify the coroner, and direct the trial court to strike the VPA and DNA collection fee from Mr. Hillestad's judgment and sentence.

No. 39084-5-III
*State v. Hillestad*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Cooney, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Staab, J.

23